UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **Clara Munger Boyer** and **KPS** (full name submitted under seal), individually and on behalf of all others similarly situated;<br><br>Plaintiffs,<br><br>v.<br><br>**Planned Parenthood Minnesota, North Dakota, South Dakota (PPMNS)**; **Planned Parenthood North Central States (PPNCS)**; **Sarah A. Traxler, MD**, in her capacity as Medical Director/Chief Medical Officer of PPMNS/PPNCS; **Planned Parenthood Federation of America, Inc. (PPFA)**;<br><br>Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT AND REQUEST FOR JURY TRIAL** |

## CLASS ACTION

Plaintiffs, Clara Munger Boyer and KPS (full name submitted under seal), by and through their undersigned counsel, bring this class action Complaint on their own behalf and on behalf of the Class they seek to represent, to obtain a Declaratory Judgment, compensatory and punitive monetary damages, and costs of suit, against the above-named Defendants, and in support thereof state the following:

## INTRODUCTION

1. This is a Civil Rights Class Action Suit brought pursuant to 42 U.S.C. § 1983 on Plaintiff's own behalf and on behalf of all pregnant mothers who were subjected to an abortion at a Planned Parenthood Minnesota, North Dakota, South Dakota (PPMNS), and Planned Parenthood North Central States (PPNCS) facility in Minnesota within the last six years.[1]

2. Every pregnant mother possesses intrinsic fundamental rights guaranteed by the 14th Amendment which protect her relationship with her child, which are among the greatest rights she possesses in all of life. The pregnant mother has a fundamental intrinsic right to keep and maintain her parental relationship with her child, a fundamental right to procreate, a protected interest in her child's welfare and child's life, and the right to the equal protection of the law, all of which are protected by the 14th Amendment, and all of which are violated by Minnesota law. The United States Supreme Court has recognized that the U.S. Constitution protects the mother-child relationship for over a century.

3. The Minnesota constitution, as interpreted by its state courts, forbids officials from imposing or requiring any protections or consent process required by the 14th Amendment before PPMNS and PPNCS solicit and accept a pregnant mother's waiver of her 14th Amendment rights and obtain her consent to terminate her relationship with her

[1] The Class includes all women subjected to surgical abortions at a PPMNS/PPNCS facility in Minnesota in the past six years, and all women subjected to a medical abortion initiated at a PPMNS/PPNCS facility in Minnesota which resulted in the death of the mother's child.

child by terminating her child's life in an abortion. PPMNS/PPNCS and PPFA have no process to ensure a mother's waiver of her rights and consent to the termination of her relationship is knowing, voluntary, and informed, a failure that is directly authorized and required by Minnesota law.

4. Under Minnesota law, intentionally killing an unborn child at any age after conception constitutes murder, which is punishable by mandatory life imprisonment. Minn. Stat. §§ 609.2661, 609.266. The murder statute is intended to protect, through deterrence, the pregnant mother's rights and interests in preserving her relationship with her child and to protect her child's life. *State v. Merrill*, 450 N.W.2d 318, 322 (Minn. 1990).

5. An abortion is not medical treatment. It employs a medical procedure to achieve a non-medical objective: termination of a mother's relationship with her child by terminating the child's life. By contrast, when a pregnant mother has a medical condition that threatens her life or a major bodily function (*e.g.*, ectopic pregnancy, severe hemorrhage from placenta percreta in previable pregnancy, metastatic cancer requiring teratogenic chemotherapy), treatment necessary to address that condition is true medical care, even if the child's death is an unintended or unavoidable consequence. Such treatment, provided within a traditional physician-patient relationship, is not by its nature an abortion and is never performed at a PPMNS/PPNCS abortion facility.

6. An abortion involves two inherent components: (1) the waiver of the pregnant mother's constitutional rights; and (2) her "consent" to the termination of her relationship with her child by the killing of her child. Neither are discussed, and there is

no informed consent process that meets the minimum requirements of the 14th Amendment.

7. Minnesota's unconstitutional laws caused pregnant mothers, including Plaintiffs and class members, to be subjected to coerced, pressured, unknowing, and uninformed abortions. Minnesota delegated to PPMNS/PPNCS and PPFA the function of terminating a pregnant mother's parental relationship, and the authority to do so without any due process protections or equal protection of the law, and Minnesota law currently forbids its officials to impose any protections of the mothers' rights, and none which are required by the 14th Amendment. As a result, the mothers' parental relationships are destroyed and their children are killed. These mothers suffered the most severe and irreparable harm – permanent loss of their life-long loving relationship with their child. Their child loses his or her life.

8. Terminating a mother's parental relationship with her child is a traditional and exclusive state function, which includes involuntary terminations for abuse or neglect and voluntary terminations, including waiver and surrender of rights in adoption. Only a court of law can legally terminate a mother's parental rights, and only after a hearing establishing the appropriate grounds for termination.

9. Minnesota creates one exception to this traditional requirement that only the state can terminate a mother's parental relationship. Minnesota delegates to PPMNS/PPNCS and PPFA the state function of terminating a mother's parental relationship by an abortion based upon the constitutionally forbidden assumption that the mother's waiver and consent is "voluntary," and informed. State officials collaborate with

PPMNS/PPNCS and PPFA to effectuate these terminations, whether voluntary or not. They accomplish termination by killing the mother's child in utero.

10. The sole justification for terminating a mother's parental rights by killing her child in an abortion is the assumption that it is performed at the mother's request, with her knowing, voluntary, and informed consent. Yet, unlike all other terminations of a mother's relationship with her child, the State imposes no 14th Amendment safeguards to ensure that it is knowing, voluntary, and informed.

11. Minnesota law grants blanket immunity from prosecution for murder to abortion doctors, nurses, and staff solely because the mother signed a "consent" form, even if the mother's consent is involuntary or uninformed, or her waiver unknowing. The State, its officials, and abortion businesses deny the protection of Minnesota's murder statute from both mother and child, a statute intended to protect the interests of both.

12. PPMNS/PPNCS and PPFA are state actors within the meaning of 42 U.S.C. § 1983. First, they act under the express authority of Minnesota's unconstitutional abortion laws that dictate the method of, and conditions for, the terminations, acting in concert and with aid from various state officials. Second, they are delegated the traditional, exclusive state function of terminating a mother's parental rights and relationship which they perform in the manner dictated by the state.

13. Prior to the *Doe v. Minnesota* decision in July 2022, Minnesota abortion law had some protections of the mother's right to her relationship with her child, but those statutes were inherently insufficient, ineffective, and violative of the 14th Amendment Due Process and Equal Protection requirements.

14. Before *Doe*, Minnesota delegated to abortion doctors and businesses the authority to terminate mothers' parental rights by statute.[2] *Doe*, however, declared that Minnesota's state constitution exclusively governs the power to terminate mothers' parental rights by abortion. *Doe* held that Minnesota's minor statutory protections violated the state constitution.[3] In essence, *Doe* delegated the power to terminate parental rights to abortion businesses, their doctors and nurses, completely unconstrained by 14th Amendment Due Process and Equal Protection requirements. As construed, the Minnesota Constitution *forbids* all protections of a mother's constitutional rights relating to her parental relationship, regardless of whether the mother wants to keep her child.

15. In 2023, the legislature repealed all the minor statutory protections that *Doe* had declared violated the state constitution.

16. Minnesota law governing termination of a mother's parental rights in an abortion is now dictated exclusively by the Minnesota State Constitution. Any state law that violates the 14th Amendment is unconstitutional, whether it originates from a statute, an explicit provision in a state constitution, or a judicial interpretation of that constitution.[4]

---

[2] *See, e.g.*, Minn. Stat. § 145.412, subd. 1 (2022) (repealed 2023) (authorization delegated to licensed physicians).

[3] *Doe v. Minnesota*, No. 62-CV-19-3868, slip op., especially at 2, 22–25, 95–109 (Minn. Dist. Ct. July 11, 2022).

[4] *See Romer v. Evans*, 517 U.S. 620 (1996) (Colorado Constitution violated Equal Protection Clause); *Reitman v. Mulkey*, 387 U.S. 369 (1967) (California Constitution violated Equal Protection Clause); "It is clear that... §1983... was intended to enforce the provisions of the 14th Amendment 'against state action, whether that action be executive, legislative, or *judicial*.'" (Emphasis Added) *Mitchum v. Foster*, 407 U.S. 225, 240 (1970) (quoting *Ex. Parte Virginia*, 100 U.S. 339, 346. (1879)).

17. Plaintiffs seek relief for injuries sustained during the relevant period, during which PPMNS/PPNCS and PPFA terminated mothers' parental rights under color of state law pursuant to both unconstitutional legal regimes: (1) the modest, insufficient statutory protections existing when Plaintiffs Clara Munger Boyer and KPS were subjected to their coerced, pressured, or uninformed abortions; and (2) the Minnesota abortion laws which lacked all protections which went into effect on July 11, 2022 following *Doe*.

18. State officials declared the state is in "partnership" with PPMNS/PPNCS and PPFA. Officials delegated to abortion facilities the traditional exclusive state function of terminating mothers' parental rights, license doctors and nurses giving them exclusive authority to perform the terminations by abortion. To advance that partnership, the State protects abortion businesses' interests, provides immunity from criminal prosecution for murder, exemption from agency scrutiny, provides public promotion of PPMNS, and provides PPMNS/PPNCS state funding.

19. Plaintiffs Boyer and KPS seek: (1) a declaration that Minnesota law violates pregnant mothers' 14th Amendment Due Process and Equal Protection rights, and their child's Equal Protection rights; (2) compensatory damages for loss of their relationship with their child; and (3) punitive damages for Defendants' reckless disregard and callous indifference to, and intentional violation of, Plaintiffs' constitutionally protected rights and interests.

20. Class action is appropriate under Fed. R. Civ. P. 23. The Class is ascertainable. Every woman who underwent an abortion at a PPMNS/PPNCS facility in Minnesota during the past six years has had her constitutionally protected rights and

interests violated because none received any of the protections required by the 14th Amendment necessary to ensure her waiver of parental rights and consent to terminate her rights and relationship were knowing, voluntary, and informed. None received any Due Process protections, and no waiver and termination was documented to be voluntary, knowing, and informed consistent with 14th Amendment requirements. The Minnesota Department of Health publishes annual abortion statistics by facility, documenting the number of women subjected to abortions at PPMNS/PPNCS facilities during the relevant period. The class of mothers whose rights have been violated in the past six years at Planned Parenthood facilities in Minnesota is approximately 44,000, and the identity of each one is preserved and ascertainable. The Class meets the numerosity, commonality, typicality, and adequacy requirements of Fed. R. Civ. P. 23(a). This class action may be maintained under Fed. R. Civ. P. 23(b)(1)(B), 23(b)(2), and/or 23(b)(3).

## JURISDICTION AND VENUE

21. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1367.

22. Plaintiffs' claims for declaratory relief are authorized by 28 U.S.C. §§ 2201, 2202, Fed. R. Civ. P. 57, and the general legal and equitable powers of this Court.

23. Venue is appropriate under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims, on their own behalf and on behalf of the Class they seek to represent, occurs in this judicial district and the Defendants are located and perform their work and duties in this district.

## PARTIES

24. Plaintiff **Clara Munger Boyer** is a Minnesota resident. PPMNS/PPNCS and PPFA subjected her to an unwanted abortion on November 26, 2021 at its Brooklyn Park, Minnesota facility. Clara's waiver of her rights and consent to termination of her relationship was not knowing, informed, and voluntary.

25. Plaintiff **KPS** (full name submitted under seal) is a Minnesota resident. She was pressured to submit to an unwanted abortion in the fall of 2020. PPMNS/PPNCS performed the abortion at its St. Paul, Minnesota facility.

26. Plaintiffs are also putative class representatives because they were pregnant mothers subjected to abortions in Minnesota by PPMNS/PPNCS and PPFA within the last six years and were not provided the minimal Due Process protections required by the 14th Amendment to protect their rights and interests.

27. Defendant **Planned Parenthood Minnesota, North Dakota, South Dakota (PPMNS)** is a Minnesota corporation with its principal place of business at 671 Vandalia Street, St. Paul, Minnesota. Since 2018, PPMNS has operated as a subsidiary of Defendant Planned Parenthood North Central States (PPNCS). PPMNS and PPNCS operate multiple abortion facilities in Minnesota and perform over 7,000 abortions annually in the state. PPMNS and PPNCS are sued as state actors acting under color of Minnesota law. PPMNS and PPNCS are so inextricably connected that they are one and the same. Plaintiffs' records bear the names of PPMNS, PPNCS, or both. They are affiliates of Defendant Planned Parenthood Federation of America, Inc. (PPFA), which establishes uniform policies and procedures for all affiliates. PPMNS/PPNCS are required to certify to PPFA

twice a year that they adhere to PPFA guidelines. PPMNS/PPNCS comply with that requirement. PPFA guidelines require PPMNS/PPNCS to deny the mothers procedures necessary to meet the minimum 14th Amendment requirements before soliciting and taking a waiver of the pregnant mother's rights and her consent to the termination of her constitutionally protected relationship with her child by the killing her child. PPFA and PPMNS/PPNCS are free to impose and follow PPFA's guidelines because the Minnesota Constitution (and the laws enforcing it) not only authorizes them to do so but forbids state officials to impose any of those minimal Due Process protections required by the 14th Amendment. When PPMNS became involved in litigation, that litigation was supervised by PPFA and PPFA in-house attorneys appeared in those lawsuits to defend PPMNS and PPFA's practices. Seven different PPFA attorneys appeared in three PPMNS lawsuits, *PPMNS v. Rounds*, *PPMNS v. Daugaard*, and *Women's Life Care Center v. PPMNS* currently in the courts. In those cases, PPFA was advised of their violations of the rights of the mothers at PPMNS/PPNCS facilities. PPMNS/PPNCS and PPFA act under the color of Minnesota state law within the meaning of 42 U.S.C. §1983. Defendant **Sarah A. Traxler, MD** is, upon information and belief, a resident of Minnesota. Dr. Traxler serves as Medical Director of PPMNS and Chief Medical Officer of PPNCS and has done so for the previous six years. Dr. Traxler is sued in her official capacity as Medical Director of PPMNS and Chief Medical Officer of PPNCS. At all times relevant, Dr. Traxler participated in, directed, authorized, and/or was responsible for terminations of pregnant mothers' rights at PPMNS/PPNCS facilities which violated their 14th Amendment rights and interests. Dr. Traxler publicly promotes the work of PPMNS/PPNCS and PPFA and

cooperates with state officials to advance Defendants' business interests. Dr. Traxler is a state actor acting under color of Minnesota law.

28. Defendant **Planned Parenthood North Central States (PPNCS)** is a Minnesota corporation with its principal place of business at 671 Vandalia Street, St. Paul, Minnesota. PPNCS operates as the parent corporation of PPMNS and operates under the supervision and direction of PPFA. PPNCS is sued as a state actor acting under color of Minnesota law.

29. Defendant **Planned Parenthood Federation of America, Inc. (PPFA)** is a New York corporation with its principal place of business at 123 Williams Street, New York, New York. PPFA establishes uniform policies, protocols, and procedures for all affiliates, including PPMNS/PPNCS. No affiliate may alter protocols, procedures, or disclosures without PPFA approval. PPFA supervises and directs litigation in which PPMNS is a party, and PPFA is intimately familiar with how PPMNS violates the 14th Amendment rights of pregnant mothers and directs them to do so. PPMNS, PPNCS, and PPFA all act under the color of state law.

## GENERAL FACTUAL ALLEGATIONS

### I. Background Legal Framework

#### A. Fourteenth Amendment Principles Governing Termination of Parental Rights

30. Every pregnant mother possesses the intrinsic fundamental rights to keep and maintain her parental relationship with her child and to procreate (which includes giving

birth), and a protected interest in her child's welfare and child's life. Pregnant mothers possess the 14th Amendment right to equal protection of the law. The protection of the mother-child relationship, is embedded in the Constitution and given preeminent legal status. That relationship is the touchstone and core of all civilized society.

31. The 14th Amendment supersedes all conflicting state laws, statutes, court orders, and state constitutional provisions. Moreover, the mother has no competing interests under the 14th Amendment which conflict with her parental rights and interests.

32. An abortion terminates a mother's constitutionally protected relationship with her child. The mother's consent constitutes a waiver of her fundamental rights. In Minnesota, such waivers are not informed or knowing. Many are involuntary. No abortion performed in Minnesota is ever documented as truly informed and voluntary. Minnesota imposes no requirements or procedures which meet the minimal requirements of the 14th Amendment. The 14th Amendment prohibits a state from creating and implementing a legal structure that solicits and enforces a waiver of fundamental rights without Due Process protections. The State must ensure the waiver and termination are knowing, voluntary, and informed.

33. The 14th Amendment prohibits state officials from handing over vulnerable mothers to private state actors who aggressively seek and obtain involuntary or uninformed waivers. Minnesota law, its officials, and state actors implementing those laws do exactly that. The State expressly authorizes abortion businesses – which have financial, ideological, and political interests in conflict with the mothers' interests – to solicit and

take "consents" that waive mothers' fundamental rights and dictates those waivers and consents be taken with no Due Process protections.

34. Minnesota fails to provide any protection for the mothers against involuntary or uninformed termination of their parental rights, in violation of the Due Process and Equal Protection Clauses. Those protections are required whether the termination is involuntary (*e.g.*, rights terminated by the state for abuse or neglect) or voluntary (*e.g.*, surrender of rights in adoption). Further, Minnesota's constitution forbids state officials from imposing any Due Process protections and dictates that abortion doctors and nurses perform terminations in a manner that violates the 14th Amendment.

## B. Minnesota's Statutory Framework for 14th Amendment Protections in Parental-Rights Terminations

### 1. Involuntary Terminations

35. Minnesota's murder statute protects mothers' rights. Intentionally killing a child in utero at any age after conception is murder, punishable by mandatory life imprisonment. Minn. Stat. §§ 609.2661, 609.266. The murder statute protects (by deterrence) both the pregnant mother's right to maintain her relationship with her child, and her interest in her child's life. *Merrill*, 450 N.W.2d at 322.

36. Minnesota statutory requirements adhere to 14th Amendment mandates when the State seeks to involuntarily terminate the mother's relationship. When the State seeks a court order terminating the mother's parental rights, the State requires: (1) a full

hearing;[5] (2) legal representation for the mother;[6] (3) the right to full participation; [7] and (4) proof by clear and convincing evidence that the child's best interests require termination.[8]

37. The child's best interests are paramount in termination proceedings.[9] These protections apply even in rare instances when a pregnant mother, already found unfit as to prior children, is threatened with termination of her parental rights to the child she carries.[10]

**2. Voluntary Terminations**

38. When Plaintiffs Boyer and KPS were subjected to their abortions, Minnesota had three statutorily-mandated court procedures (two relating to pregnant mothers) before a mother could voluntarily waive her parental rights and submit to the termination of her parental relationship: (1) non-abortion-related terminations (adoptions); (2) abortion-related terminations ("judicial bypass" for minors);[11] and (3) post-birth voluntary terminations (surrender when under state investigation for unfitness).[12]

39. A pregnant mother may waive her parental rights in an adoption proceeding, subject to strict safeguards to help ensure her waiver is knowing, voluntary, and informed.

---

[5] Minn. Stat. § 260C.307 (2025).
[6] *Id*. § 260C.163 (2025).
[7] *Id*.
[8] Minn. Stat. § 260C.317 (2025).
[9] *In re Welfare of Child. of B.J.B.*, 747 N.W.2d 605, 608 (Minn. Ct. App. 2008); *see also In re Welfare of Child. of D.F.*, 752 N.W.2d 88, 97 (Minn. Ct. App. 2008) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).
[10] *See, e.g.*, *In re Welfare of J.W.*, 807 N.W.2d 441 (Minn. Ct. App. 2011).
[11] *Doe v. Minnesota*, No. 62-CV-19-3868, slip op. at 3, 22-25, 95-109 (Minn. Dist. Ct. July 11, 2022) (holding that the parental notification requirement violates the Minnesota State Constitution).
[12] Minn. Stat. § 260C.301 (2025).

In agency-assisted adoption, the mother must receive full disclosure of her rights,[13] and cannot sign an enforceable waiver until three days after birth (only after she gets to see and hold her baby and more fully appreciate what she is giving up).[14] In direct adoptive placement, the mother is entitled to full counseling and an attorney at no cost to her,[15] and a hearing before a judge who cannot enter an order terminating her parental relationship without first finding that the waiver of her rights is voluntary and informed.[16] Whether agency-assisted or a direct adoptive placement, the State always seeks to protect the child's best interests,[17] the mother's parental rights can be terminated only by an order of a court of law,[18] and the mother can revoke her consent after signing the waiver of her rights.[19]

40. Under Minnesota's previous "judicial bypass" procedure, minors seeking abortion could bypass the two-parent notification law. Abortion providers could not perform an abortion without court authorization before accepting a mother's waiver. The statute is an acknowledgment that pregnant mothers are often subjected to undue influence from others whose interests conflict with hers, and who seek to impose their will upon her. The court was required to advise the mother of her right to court-appointed counsel, conduct an appropriate hearing, make specific findings of fact and conclusions of law, and make a permanent record.[20] While Minnesota law provided protections through court

---

[13] Minn. Stat. § 259.24, subds. 5–6 (2025).
[14] *Id.* subd. 2(b).
[15] Minn. Stat. § 259.47, subds. 4–5 (2025).
[16] *Id.* subd. 7.
[17] Minn. Stat. § 259.57, subd. 2 (2025).
[18] *Id.* subd. 1(a); Minn. Stat. § 259.24, subd. 5 (2025).
[19] Minn. Stat. § 259.24, subd. 6(a) (2025); Minn. Stat. § 259.47, subd. 7 (2025).
[20] Minn. Stat. § 144.343 (2022) (repealed 2023). *See also Doe*, *supra* note 11, slip

proceedings for some pregnant mothers fearing coercion in connection with abortion, Minnesota denied court procedures and accompanying protections for other pregnant mothers, including Plaintiffs, who wanted to keep their child, and who wanted protection from pressure and coercion to submit to an unwanted abortion.

41. Minnesota law governs voluntary waiver and termination when a mother is under state investigation for unfitness.[21] The court must conduct hearings in the same manner as involuntary termination under Minn. Stat. § 260C.301, subd. 1(b). The State bears the burden of proof. The voluntary nature of the waiver must be proven by clear and convincing evidence.[22] The mother has the right to be heard, to participate, to legal counsel or court-appointed counsel, and to testify, present evidence, and cross-examine witnesses.[23] The child's best interests are paramount.[24]

42. Only a court can terminate a mother's parental rights, whether the termination is involuntary or voluntary, and whether in the context of abortion (for some mothers) or adoption.

### C. Minnesota's Abortion Laws and State Action

43. Minnesota abortion laws depart from traditional norms. Traditionally, only the State, through its courts, can terminate parental rights. Minnesota delegated some terminations to abortion businesses, their doctors and employees. No state court or

---

op. at 3, 22–25, 95–109.

[21] *Id*. § 260C.301, subd. 1(a) (2025).

[22] *Id*. § 260C.163 (2025).

[23] *Id*. § 260C.301, subds. 1-4, 8 (2025).

[24] *Id*. § 260C.301, subd. 7 (2025).

governmental authority stands between anyone coercing a mother into abortion and the entities that profit from it.

44. That flaw in Minnesota law – fatal by itself – is compounded by complete lack of protections, due process, or equal protection. State officials promulgate, administer, and enforce abortion laws that authorize and effectuate involuntary terminations. Coerced and pressured abortions and uninformed waivers result.

45. Prior to *Doe v. Minnesota* in July 2022, Minnesota abortion statutes contained modest protections, but they were inherently ineffective. The State's delegation to abortion businesses makes effective protections impossible. *Doe* declared that Minnesota's Constitution exclusively delegates to abortion doctors and nurses the power to terminate mothers' parental rights. *Doe* held that Minnesota's minor statutory protections violated the state constitution.[25]

46. The prior laws delegated the termination of a mother's parental relationship to licensed physicians, providing: (a) only physicians could perform abortions; (b) abortions could occur only at abortion facilities or hospitals; (c) violations were felonies; and (d) abortion businesses were subject to mandatory reporting requirements.[26]

47. Those statutes also required abortion providers to disclose certain medical risks (*e.g.*, infection), the father's legal obligation to provide financial support, and where the mother could obtain help to keep her child.[27] In practice, these disclosures were never

---

[25] *See also Doe*, *supra* notes 11, 20, slip op. at 3, 22–25, 95–109.
[26] Minn. Stat. §§ 145.412, subd. 1 (2022) (repealed 2023).
[27] *Id*. §§ 145.4241–145.4249.

discussed with mothers, just buried in documents. The laws provided a 24-hour wait period between the initial phone call and the abortion.[28] That inadequate period was in stark contrast to Minnesota's requirement that pregnant mothers must be given the full nine months of pregnancy before waiver of her rights could be recognized in an adoption. That waiver could only be made after birth, may be revoked, and the mother can appeal an improper order of termination. In an abortion, there was no revocation and no order to appeal. That rushed 24-hour "decision," made under stress, was final and irrevocable. The Department of Health was required to promulgate regulations for abortion facilities, but none were written or adopted.[29]

48. The prior laws did not require meaningful discussion of disclosures necessary for an informed waiver, such as: (a) an abortion terminates the life of a whole, separate, unique, living human being; (b) killing that human being, at any time in utero, is murder punishable by life imprisonment; (c) the mother's consent authorizes that killing and immunizes the abortion provider from murder prosecution; (d) the mother has an existing relationship with her unborn child; and (e) the mother possesses a fundamental right to maintain her relationship, and her consent waives her constitutional rights.

49. The pre-*Doe* laws made involuntary abortions illegal. However, provisions authorizing termination of the mother's relationship imposed no procedures designed to ensure the termination was voluntary and informed, and none meeting the minimum requirements of Due Process. No state court or authority stood between anyone coercing

---

[28] Minn. Stat. § 145.4242 (2022) (repealed 2023).

[29] *See* Minn. Stat. § 145.416 (2025); § 145.412, subd. 1(3) (2022) (repealed 2023).

a mother and the abortion business that killed her child. If the mother's waiver and consent are not voluntary and informed, the act is murder under Minnesota law. No provisions helped mothers resist coercion and pressure, and, as a result, PPMNS/PPNCS and PPFA only encouraged submission to abortion and even pressured the mothers into one.

50. In 2023, the Minnesota legislature repealed all these statutory provisions, including the prohibition against involuntary abortion and the 24-hour wait period.[30] Minnesota left in place only the law created by *Doe*.[31]

51. PPMNS/PPNCS, with the aid of state officials, continues to terminate mothers' parental relationships under Minnesota's unconstitutional abortion laws. PPMNS/PPNCS and PPFA perform an exclusive traditional state function. They are immunized and empowered to deny due process protections, destroying mothers' constitutional rights. This empowerment is the equivalent to the State itself conducting the termination. The State delegates to the Defendants unconstitutional conduct the State is forbidden to perform.

52. Minnesota limits the power to terminate the mother's relationship to those it empowers by issuing medical or nursing licenses.[32] Minnesota protects these delegates by immunizing them from murder prosecution, even when the killing is involuntary. No one else receives that power or immunity.

---

[30] *See* 2023 Minn. Sess. Law Serv. ch. 70, art. 4, § 113 (West).
[31] *Id.*
[32] *Doe*, *supra* notes 11, 20, 25, slip op. at 2, 58-70.

53. Minnesota agencies cannot investigate these licensees and abortion businesses for acts that may trigger criminal or civil liability or professional sanctions. On June 25, 2022, Governor Walz issued an emergency executive order requiring all state agencies to coordinate to protect abortion providers. It forbade agencies from investigating providers or initiating proceedings to impose liability or sanctions.[33]

54. Minnesota defames and slanders pregnancy help centers (PHCs) that seek to protect the rights of pregnant mothers. In August 2022, Attorney General Ellison issued a "Consumer Alert" promoting abortion and discouraging mothers from seeking help at any of the fewer than 100 Minnesota PHCs. Much of the Consumer Alert is inaccurate. It obstructs a mother's opportunity to exercise her right to keep her child. It asks the public to report anything about PHCs they think is "deceptive" or "inaccurate." The Consumer Alert also advises mothers who started medical abortion but decided to keep their children not to seek progesterone treatment that could save their children's lives.[34] The State and the Attorney General have not issued any "alerts" that warn of the deceptive practices of abortion facilities or ask for reports about their deceptive practices.

55. On January 8, 2024, Governor Walz appeared at a press conference with PPNCS CEO Ruth Richardson and PPMNS/PPNCS Medical Director Sarah Traxler, MD. Governor Walz called PPMNS/PPNCS the state's "partner." He pledged to give

[33] Minn. Exec. Order No. 22-16, Protecting Access to Reproductive Health Care Services in Minnesota (June 25, 2022), mn.gov., https://www.lrl.mn.gov/archive/executive orders/22-16.pdf.

[34] *Consumer Alert: Crisis Pregnancy Centers*, Minn. Att'y Gen. (Aug. 23, 2022), ag.state.mn.us., https:// www.ag.state.mn.us /AbortionRights/.

PPMNS/PPNCS whatever "tools" it needed to advance its work. Governor Walz boasted that in 2023, he and the legislature repealed all modest protections for mothers' rights, including the prohibition against involuntary abortions. He called them "harmful." Medical Director Traxler praised Minnesota's "supportive political environment." She said it encourages expansion of abortion providers because they "know they are protected."[35]

56. The Department of Children, Youth, and Families oversees protection of pregnant mothers and their children in connection with involuntary termination of mothers' parental relationships. It fails to provide any protection of mothers' parental rights and interests when terminated by abortion.[36]

57. The Department of Human Services administers Medicaid reimbursements that pay PPMNS/PPNCS to terminate mothers' parental relationships, including terminations that are coerced, pressured, or uninformed.[37] The Department fails to discharge its responsibility to implement due process procedures to protect against involuntary and uninformed abortions before paying for them.

## II. Planned Parenthood's National Model Resulting in Coerced, Pressured, and Uninformed Abortions

58. Pregnant mothers are often coerced, pressured, and deceived into submitting to abortion. This has been well known for many years.

---

[35] *Jan. 8, 2024 Press Conference with State Officials and Representatives of PPMNS/PPNCS*, YouTube (FOX 9 Minneapolis-St. Paul Jan. 8, 2024), youtube.com, https://www.youtube.com/ live/H_ntpntcQT4?si=sYYDgbq3o5aODywK.

[36] *See* Minn. Stat. § 260E.

[37] Minn. Stat. § 256B.0625, subd. 16.

59. The most extreme coercion involves physical violence. Many men have been documented to have murdered pregnant mothers for refusing to submit to an abortion.[38] Murder is a leading cause of death among pregnant mothers.[39]

60. Women are coerced into abortions by violence and threats of violence.[40]

61. PPMNS/PPNCS and PPFA have known about forced abortions for years.[41]

62. Planned Parenthood doctors and workers coerce, pressure, and deceive pregnant mothers into submitting to abortion.[42]

63. Planned Parenthood workers must meet abortion quotas, which prevents any real counseling.[43]

---

[38] *See* Ex. B, List of Women Murdered for Refusing Demands to Have an Abortion, Declaration of Katherine E. Hartmann, MD, PhD, *Women's Life Care Center v. Ellison,* No.0:24-cv-04250 (D. Minn. Jan. 12, 2024), ECF 113-3.

[39] Sandra L. Martin et al., *Pregnancy-Associated Violent Deaths: The Role of Intimate Partner Violence*, 8 Trauma, Violence, & Abuse 135–48 (2007); Jeani Chang et al., *Homicide: A Leading Cause of Injury Deaths Among Pregnant and Postpartum Women in the United States, 1991–1999*, 95 Am. J. Pub. Health 471–77 (2005).

[40] *See, e.g.*, *PPMNS v. Daugaard/Noem*, Declaration of Vixie Miller, ¶¶ 8–14 (D.S.D. Nov. 27, 2019), ECF No. 222 (Vixie's husband forced her to have an abortion and overcame her resistance by brandishing his handgun and a foot-long knife); Declaration of Margie Ayers (D.S.D. May 7, 2019), ECF No. 218 and Declaration of Myrna Deere (D.S.D. Apr. 1, 2021), ECF No. 353 (Margie's mother forced her to have an abortion by physically attacking her and threatening to "kick the baby out of" her (Ayers Decl., ¶ 11); Margie told the Planned Parenthood nurse and doctor that she wanted to keep her baby, but Planned Parenthood performed the abortion anyway).

[41] *See PPMNS v. Daugaard/Noem*, Miller Decl., ECF No. 222; Ayers Decl., ECF No. 218; Deere Decl., ECF No. 353.

[42] *See, e.g.*, *PPMNS v. Noem*, Declaration of Susan Thayer, ¶¶ 7–14, 32–42 (D.S.D. Aug. 22, 2019), ECF No. 210; Declaration of Annette Lancaster, ¶¶ 9, 14–15 (D.S.D. Mar. 13, 2019), ECF No. 212; Declaration of Abby Johnson, ¶ 17 (D.S.D. Nov. 22, 2019), ECF No. 211.

[43] Abby Johnson Decl., ¶ 18, *PPMNS v. Daugaard/Noem*, ECF No. 211.

64. Planned Parenthood doctors have forced mothers to have abortions, even physically holding them down.[44]

65. Former Planned Parenthood workers know that many mothers brought to their abortion facilities are coerced. The abortions are performed anyway.

66. Many women subjected to coerced, pressured, uninformed, or unwanted abortions suffer emotional and psychological harm.

67. Planned Parenthood Federation of America (PPFA) dictates, develops, and controls all policies, protocols, and disclosure forms for its nationwide affiliates.

68. Planned Parenthood affiliates cannot alter PPFA disclosures or consent procedures – including state-mandated disclosures – without express PPFA approval.

69. To maintain their affiliate status, Planned Parenthood affiliates must certify compliance with PPFA policies and protocols bi-annually.

70. PPFA requires affiliates to use training materials produced by the Consortium of Abortion Providers (CAPS). Some materials promote techniques to persuade ambivalent mothers and mothers with moral or religious objections to submit to abortion.

71. PPFA creates and provides copyrighted "educational" and marketing materials to affiliates. Some materials discourage mothers from obtaining assistance at PHCs.

---

[44] *See, e.g.*, *Women's Life Care Center v. Ellison*, Declaration of Myra Neyer, ¶ 14, No. 0:24-cv-04250 (D. Minn. Feb. 5, 2024), ECF No. 105; First Declaration of Mayra Rodriguez, ¶ 15 (D. Minn. Jan. 5, 2024), ECF No. 103.

72. Abortion doctors are hired on a contract basis and compensated based upon the number of procedures they perform. They have a financial interest to maximize the number of abortions they perform.

73. Contract abortion doctors must follow PPFA protocols. They do not personally provide disclosures or pre-termination (pre-abortion) "counseling."

74. PPFA's strict oversight ensures nearly identical policies, procedures, and practices across all Planned Parenthood affiliates.

75. PPFA training and policies presume the mother has already made a voluntary and informed decision to submit to abortion by the time she arrives at a Planned Parenthood facility.

76. Planned Parenthood abortion facilities do not assist patients in decision-making. They do not screen for third-party coercion or pressure.

77. PPFA establishes policies and procedures to maximize the number of abortions they sell, greatly increasing the number of abortions, most of which subject pregnant mothers to abortions when they prefer to keep their child.[45] PPFA imposes those policies and procedures upon their affiliates, including PPMNS/PPNCS. PPFA supervises and controls the litigation in which PPMNS appears, both as a plaintiff and as a defendant. PPFA maintains staff attorneys in its New York office and elsewhere who supervise and direct that litigation. PPFA in-house attorneys appeared and participated in three recent cases in which PPMNS was a party, *PPMNS v. Rounds*, and *PPMNS v. Daugaard* in which

[45] Abby Johnson Decl., ¶ 17, *PPMNS v. Daugaard*, ECF No. 211.

PPMNS were plaintiffs, and in the current case of *Women's Life Care Center, et al. v. PPMNS, et al.*, in which PPMNS is a defendant. Seven PPFA in-house attorneys appeared in those cases. In the *Rounds* case, PPFA in-house attorneys defended depositions and deposed witnesses. One PPFA in-house attorney deposed a woman forced to have an abortion performed by PPMNS for six hours. During that deposition, the woman openly wept. PPFA and PPMNS have reviewed the dozens of sworn declarations from women subjected to unwanted abortions performed at Planned Parenthood facilities and well-know the harm their procedures cause pregnant mothers. In two of the mentioned cases, PPFA and PPMNS opposed state statutes designed to protect the mothers' constitutional rights, lost every issue, but have failed to obey the court orders and to provide the mothers with the modest disclosures required. In the current case pending in the Eighth Circuit Court of Appeals, PPFA and PPMNS attempt to defend Minnesota's unconstitutional laws that delegate the termination of the mothers' parental relationship without the protections required by the 14th Amendment.

78. PPMNS's practices and procedures are the same as those used throughout Planned Parenthood affiliates across the nation.[46]

## III. PPMNS/PPNCS/PPFA Derelictions and Knowledge

79. Although Minnesota has delegated to PPMNS/PPNCS and PPFA the function of accepting a pregnant mother's waiver of her parental rights, it has never

[46] *See PPMNS v. Daugaard*, Declaration of Patricia Giebink, MD, ¶ 13 (D.S.D. Dec. 7, 2019), ECF No. 232; Abby Johnson Decl., ¶¶ 1, 8–12, ECF No. 211; Thayer Decl., ¶¶ 32–42, ECF No. 210.

instituted any procedures to ensure that a mother's submission to an abortion is truly knowing, voluntary, and informed. None of the pregnant mother's waivers of their rights and "consents" to the termination of their parental relationship by the killing of their child is truly knowing, informed, and voluntary. PPMNS/PPNCS and PPFA's practices ensure that many waivers and "consents" result from pressure or coercion by other persons and, in some instances, from abortion facility workers. No assistance is given to mothers who are ambivalent or who would prefer to keep their child. Planned Parenthood workers are forbidden to inform a pregnant mother where she can obtain such assistance. Planned Parenthood workers who have provided such information have been fired for doing so. PPMNS's and PPFA's derelictions that destroy the rights of pregnant mothers are severe, legion, and well documented.[47] All of those derelictions are expressly authorized by Minnesota law, and Minnesota's constitution forbids state officials from providing any of the protections of the mothers' rights required by the 14th Amendment. The state officials work with PPMNS/PPNCS to violate the mothers' rights.

80. PPMNS/PPNCS and PPFA have disregarded mothers' constitutional rights for over two decades. In 2005, South Dakota convened a bipartisan Task Force which examined PPMNS's practices. PPMNS performed almost all abortions in the state.[48] The

[47] For extensive evidence of PPMNS's reckless disregard and callous indifference to the mothers' rights and interests, including material admissions by PPMNS, *see* declarations filed in support of the motion to dissolve the preliminary injunction in *PPMNS v. Daugaard*, ECF Nos. 206–270.

[48] South Dakota Task Force to Study Abortion, *Report of the South Dakota Task Force to Study Abortion* (2005), at 14, n3, Third Declaration of Harold J. Cassidy, *PPMNS v. Noem* (D.S.D. Mar. 12, 2020), ECF No. 267-51.

Task Force concluded that PPMNS failed to make essential disclosures, provided misleading information, and employed inherently coercive procedures. It found that mothers were often pressured into abortions, the "overwhelming majority" of abortions were uninformed, and there was "no true physician-patient relationship" at PPMNS.[49]

81. South Dakota passed its 2005 Informed Consent and 2011 Anti-Coercion statutes[50] to protect the pregnant mother's existing "constitutionally protected interest in her relationship with her child." [51] PPMNS, its Medical Director, Dr. Ball, and PPFA unsuccessfully challenged both statutes.[52] Throughout 17 years of litigation, women testified that they were subjected to coerced and pressured abortions at PPMNS/PPNCS, including by PPMNS/PPNCS doctors and workers. The statutes PPMNS refused to obey were expressly enacted to protect the mothers' rights that PPMNS violated.

82. PPMNS/PPNCS's South Dakota lawsuits demonstrate that Defendants have long known that they have been terminating the intrinsic fundamental rights of pregnant mothers, and that their practices have violated those rights. Defendants have long been aware of the devastating loss to those mothers. Defendants know their reckless disregard and callous indifference to mothers' rights and interests cause deep psychological

[49] *Id.* at 37–38.

[50] S.D. Codified Laws § 34-23A-1, subd. 4 (definitions) (2005), S.D. Codified Laws §§ 34-23A-1.2 to -1.7 (findings) (2005), § 34-23A-10.1 (2005); S.D. Codified Laws §§ 34-23A-53, subds. 1, 4 (definitions) (2011), §§ 34-23A-54, subds. 1–5 (findings) (2011), §§ 34-23A-55 to -62 (2011); *see* S.D. Codified Laws §§ 34-23A-74 to -88 (2018).

[51] S.D. Codified Laws § 34-23A-1.4 (2005); S.D. Codified Laws § 34-23A-54, subds. 3, 5 (2011).

[52] Complaint, *Planned Parenthood Minn., N.D., S.D. ("PPMNS") v. Rounds*, 4:05-cv-04077-KES (D.S.D. June 6, 2005), ECF No. 1; Complaint, *PPMNS v. Daugaard/Noem*, No. 4:11-cv-04071-KES (D.S.D. May 27, 2011), ECF No. 1.

suffering. Minnesota's state officials and courts were aware of PPMNS's violations but continued to partner with them and to expressly authorize PPMNS's ongoing violations.

### A. PPMNS/PPNCS/PPF's Actual Knowledge That Its Longstanding Practice of Performing Involuntary and Uninformed Abortions Violates Mothers' Rights

#### 1. PPMNS/PPNCS/PPFA Performs Coerced and Pressured Abortions

83. PPMNS/PPNCS facilities have no "informed consent" process.

84. PPMNS/PPNCS and PPFA assume pregnant mothers have already decided to have an abortion by the time they arrive at one of their facilities.

85. PPMNS/PPNCS performs abortions even when the procedure is scheduled at the request of someone other than the pregnant mother.[53]

86. Upon arriving at a facility on the day of their scheduled abortion, PPMNS/PPNCS, following PPFA mandatory protocols, requires mothers to complete and sign forms before speaking with a physician or "counselor." These forms include the "consent" form.[54]

87. PPMNS/PPNCS requires pregnant mothers to pay for the abortion before meeting with a physician or "counselor." Planned Parenthood facilities throughout the

---

[53] *See, e.g.*, *PPMNS v. Daugaard,* Declaration of Alyssa Carlson, ¶ 8 (D.S.D. Oct. 21, 2018), ECF No. 209 and Declaration of B.H., ¶ 12 (D.S.D. Apr. 8, 2019), ECF No. 206.

[54] *See, e.g. PPMNS v. Daugaard/Noem*, B.H. Decl. ¶ 13; Decl. of Brittany (Wilson) Weston, ¶ 19 (D.S.D. Dec. 16, 2019) ECF No. 207; Decl. of S.C. ¶ 6 (D.S.D. Mar. 30, 2019) ECF No. 208.

country, under direction of PPFA, employ this practice, which is designed to increase psychological pressure on the mother to submit to abortion. It is dictated by PPFA, which imposes the practice in Minnesota. PPFA is a state actor, acting under the color of Minnesota state law.

88. PPMNS/PPNCS pressures its doctors and workers to "sell" abortions and perform them quickly. At PPMNS's facility, "there was constant pressure to 'sell' surgery… because it was a source of revenue." PPMNS pressured physicians to perform as many abortions as possible.[55]

89. Pregnant mothers administered Mifepristone (to start a medical abortion) at an abortion facility often seek progesterone treatment in Minnesota to save their child's life. This evidences pressure to abort or, at minimum, ambivalence.[56]

90. Many mothers who arrive at a PPMNS/PPNCS facility on the day of their scheduled abortion cry. This often indicates she does not want an abortion. PPMNS/PPNCS does not explore the reason for her distress. It performs the abortions anyway.

91. PPMNS/PPNCS and PPFA are aware of their ongoing violations of the pregnant mothers' rights and interests.

[55] Giebink, MD Decl., ¶¶ 22–23 (quote from ¶ 22), *PPMNS v. Noem*, ECF No. 232.

[56] *See Women's Life Care Center v. Ellison,* Declaration of David Billings, MD, ¶¶ 11–14 (D. Minn. Sep. 28, 2024), ECF No. 130; Declaration of Michael Valley, MD, ¶¶ 4–9 (D. Minn. May 17, 2023), ECF No. 142; Declaration of Matthew Anderson, MD, ¶¶ 2, 8, (D. Minn. May 27, 2023), ECF No. 141; Declaration of Mary Davenport, MD (First), ¶¶ 4–14, 16–21 (D. Minn. Feb. 8, 2023), ECF No. 117; Declaration of Mary Davenport, MD (Second), ¶¶ 2–8 (D. Minn. July 11, 2024), ECF No. 118.

92. In 2021, L.M. filed a declaration in *PPMNS v. Daugaard/Noem*. She testified that her boyfriend forced her to submit to an abortion performed at PPNCS's Sioux City, Iowa facility in late 2020.[57] L.M. cried openly at the facility. PPNCS workers witnessed her crying and distress. A PPNCS "counselor" heard her begging her boyfriend on the phone not to force her to have an abortion. PPMNS/PPNCS performed the abortion anyway.[58] L.M. testified that PPMNS/PPNCS "actually did the bidding of [her boyfriend]. Planned Parenthood acted as if they were protecting his right to compel an abortion, not my right to decide for myself that I wanted my child."[59] L.M. testified how devastating the abortion was. She "hated" herself for "allowing [her boyfriend] to force [her] into having the abortion."[60] She became "obsessed with the thought of suicide."[61]

93. In 2019, B.H. submitted a declaration in *PPMNS v. Daugaard/Noem*. She testified she was coerced into an abortion performed at PPMNS/PPNCS's Sioux Falls, South Dakota facility in 2012.[62] B.H.'s father called PPMNS, which scheduled the abortion without speaking to B.H. or obtaining her permission. Her father drove her to PPMNS/PPNCS's Sioux Falls facility. He brought her inside, paid for the procedure, and completed her paperwork. Her father told her to sign the papers. B.H. did not know what she signed; she was not given a chance to speak with anyone at PPMNS beforehand.[63] The

---

[57] *See* Declaration of L.M. (D.S.D. Feb. 22, 2021), *PPMNS v. Noem*, ECF No. 302.
[58] *Id*. ¶¶ 17–19.
[59] *Id*. ¶ 21.
[60] *Id*. ¶ 26.
[61] *Id*. ¶ 27.
[62] *See* B.H. Decl., *PPMNS v. Daugaard*, ECF No. 206.
[63] *Id*., ¶¶ 12–13.

abortion doctor did not engage in any discussion to determine if she wanted an abortion.[64] Immediately after the abortion, B.H. experienced major psychological problems. B.H. testified she "wished that there had been a way for me to prevent my father and Planned Parenthood from killing my child."[65] She summarized her loss:

> I wanted my baby who died in the abortion. I feel that I had the right to keep her and that right should have been respected. I am the one forced to live with the pain of losing my baby, the isolation of it, and the guilt and depression that followed.[66]

94. Brittany Weston submitted a declaration in both *PPMNS v. Rounds* and *PPMNS v. Daugaard/Noem*. She testified that her baby's father forced her to submit to an abortion performed at PPMNS's Sioux Falls, South Dakota facility in 2005. PPMNS performed the abortion knowing Brittany did not want it.[67] There was no informed consent process. PPMNS made no effort to determine if Brittany was submitting to the abortion voluntarily. She "was bawling" at the facility in front of PPMNS workers. She blurted out to one worker, "I feel like I'm killing my baby if I go through with this."[68] PPMNS subjected Brittany to the abortion anyway.[69] The forced abortion caused Brittany deep

---

[64] *Id.* ¶¶ 13–19.

[65] *Id.* ¶¶ 23.

[66] *Id.* ¶ 30.

[67] *See* Brittany Weston's declaration submitted under the pseudonym "Jane Doe #1," *PPMNS v. Rounds*, ECF No 119; Declaration of Brittany (Wilson) Weston, *PPMNS v. Daugaard*, ECF No. 207.

[68] Weston Decl., ¶¶ 28–37 (quotes from ¶¶ 33, 35), *PPMNS v. Daugaard*, ECF No. 207.

[69] *Id.* ¶¶ 39–46.

depression.[70] A PPFA staff attorney deposed Brittany for six hours in *Rounds*, putting all Defendants on further notice of how her rights had been violated.

95. In 2018, Alyssa Carlson submitted a declaration in *PPMNS v. Daugaard/Noem*. At age 19, her mother forced her to submit to an abortion performed at PPMNS's Sioux Falls facility in 1994.[71] When Alyssa became pregnant, she was living with her mother, who immediately insisted she have an abortion. Alyssa's mother called PPMNS, which scheduled the abortion without speaking with Alyssa or obtaining her permission. Her mother drove her to PPMNS's facility to ensure Alyssa would keep the appointment. Alyssa cried the entire time she was at PPMNS. PPMNS performed the abortion anyway. Alyssa testified: "I wanted to have my baby, but my mother effectively compelled me to have an abortion. … The pressure she placed on me was unbearable, and there was no one to offer me help…." The abortion caused Alyssa severe emotional problems.[72]

96. S.C. submitted a declaration in *PPMNS v. Daugaard/Noem* alerting PPMNS/PPNCS that its workers and physicians pressured her to complete a second-trimester abortion at its St. Paul, Minnesota facility on March 2, 2017.[73] S.C. learned she was pregnant shortly after her marriage ended. She worked but had little money and no savings. She knew the father would provide no financial or emotional support. S.C.

---

[70] *Id*. ¶¶ 49–52.

[71] *See* Carlson Decl., *PPMNS v. Daugaard*, ECF No. 209.

[72] *Id*., ¶¶ 4–9, 10–16 (quotes from ¶¶ 7, 16).

[73] *See* Declaration of S.C. (D.S.D. Mar. 30, 2019), *PPMNS v. Daugaard/Noem*, ECF No. 208.

wanted her baby but felt constrained to have an abortion because she lacked resources. She felt confused and isolated. Although conflicted and ambivalent, she called PPMNS/PPNCS, which scheduled her abortion.[74]

97. Upon arrival at the St. Paul facility, PPMNS/PPNCS required S.C. to sign a "consent" form and pay for the abortion before she met any nurse, doctor, or "counselor." PPMNS/PPNCS did not screen her for risk factors. It provided no pre-termination counseling or informed consent process. It did not explain the abortion procedure. S.C. was extremely nervous. The lack of information heightened her anxiety. After receiving an ultrasound, staff led her into another room. A PPMNS/PPNCS nurse gave S.C. a white pill without explanation. S.C. asked whether the pill would harm her baby if she did not proceed with the abortion. The nurse did not explain that the pill would stop fetal development. Instead, the nurse told S.C. the doctor could answer her questions and instructed her to take the pill.[75]

98. Staff then told S.C. for the first time that the abortion would take two days. PPMNS/PPNCS would insert dilators, and S.C. would return the following day. S.C. asked the doctors whether she could discontinue the abortion process after the dilators were inserted. The doctors told S.C. that her baby could be harmed if she did not complete the abortion.[76] A doctor inserted the dilators. Without explanation, he then revealed a needle. Alarmed, S.C. asked what the needle was for. The doctor explained he was injecting a

[74] *Id.* ¶¶ 3–5.
[75] *Id.* ¶¶ 6–10.
[76] *Id.* ¶¶ 11–12.

substance to stop the baby's heartbeat. This caused S.C. to realize she was "allowing the doctors to kill [her] baby."[77] S.C. then asked what PPMNS/PPNCS would do if her baby was "born alive after the abortion procedure had already started." The doctor "said something like: 'most likely we would break its neck.'" S.C. grasped the cruelty and brutality of abortion. She wanted to leave right away. Staff cleared her to leave shortly afterwards.[78]

99. When S.C. returned the following day, she told the PPMNS/PPNCS doctors she did not want to proceed with the abortion. The doctors argued with her. They forcefully tried to persuade her to submit to the abortion. S.C. resisted PPMNS/PPNCS's pressure and left the facility.[79] S.C. gave birth in June 2017. Her son has been a source of joy and fulfillment.[80] Her declaration explains that PPMNS/PPNCS violated her rights and interests and that she suffered emotional harm as a result.[81]

100. Even without external pressure or coercion, a pregnant mother's circumstances often stress her enough to impair her normal, healthy decision-making.

### 2. No Mother's Waiver of Her Rights and Consent to Terminating Her Rights and Relationship Is Knowing and Informed

101. In addition to PPMNS/PPNCS/PPFA abortions resulting from coercion, pressure, and deception, none of the mothers' waivers of their parental rights are truly knowing. None of their consents to termination of their relationship with their child by the

---

[77] *Id.* ¶¶ 13–14 (quote from ¶ 14).
[78] *Id.* ¶ 16.
[79] *Id.* ¶ 18.
[80] *Id.* ¶ 1.
[81] S.C. Decl. (especially, ¶¶ 20–26), *PPMNS v. Daugaard*, ECF No. 208.

killing of their child are truly informed. PPMNS/PPNCS performs abortions on ambivalent mothers and on mothers who do not want the procedure.

102. PPMNS's Medical Director, Dr. Ball, admitted that a pregnant mother's decision to maintain or end her relationship with her child is not a medical decision.[82] Another PPMNS physician admitted this fact, and acknowledged that she had no expertise or qualifications to counsel a mother about that decision.[83]

103. Dr. Ball admitted that "the relationship that a mother has with her child can give great joy and benefit to the mother over her lifetime"; "the right that a mother has to keep her relationship with her child is one of the greatest rights that a mother would have in her lifetime"; and the decision of a pregnant mother to keep or give up her relationship with her child – regardless of the circumstances – is one of the greatest decisions for a mother to face, is very difficult, and one that has significance for her.[84]

104. PPMNS and Dr. Ball admitted that they knew that it was a criminal homicide in South Dakota for any person to intentionally kill an unborn child at any age after conception, and that the only thing immunizing PPMNS abortion doctors from criminal prosecution under that homicide statute is their obtainment of a signature on a "consent" form.[85]

---

[82] Deposition of Carol Ball, MD (PPMNS Medical Director) Mar. 14, 2014, at 52:8–13, First Declaration of Harold J. Cassidy, *PPMNS v. Noem* (D.S.D. Mar. 10, 2020), ECF No. 266-3.

[83] Deposition of Nicola Moore, MD (PPMNS physician) May 16, 2014, at 142:20 - 144:3, Cassidy First Decl., *PPMNS v. Noem*, ECF 266-4.

[84] Dr. Ball Dep., Mar. 14, 2014, at 49:11–22 (Ex. 1) and 49:23 - 50:17 (Ex. 2), Cassidy First Decl., *PPMNS v. Noem*, ECF Nos. 266-1 and 266-2.

[85] Dr. Ball Dep., Mar. 14, 2014, at 65:18 - 66:1, Cassidy First Decl., *PPMNS v.*

105. PPMNS/PPNCS provides no information about the child the mother is carrying or about fetal development. PPMNS "patient educators" cannot answer relevant questions a mother might have about her unborn child.

106. PPMNS/PPNCS offers no true counseling services and employs no "counselors." It provides no real education for mothers considering abortion.

107. No traditional physician-patient relationship exists between PPMNS/PPNCS physicians and mothers subjected to abortions at its facilities.[86]

108. Two main groups of facts and disclosures are critical for a mother to make a truly informed decision to waive her rights and consent to abortion. PPMNS/PPNCS withholds them.

109. The first category relates to the nature of the procedure abortion businesses propose to perform, and the result. The mother must understand she has an intimate relationship with an existing human being. She must understand she has a constitutional right to keep and maintain that relationship. The 14th Amendment and state law (like Minnesota's murder statute) protect that right. She must understand she is waiving that intrinsic, fundamental right. For informed waiver and consent, the mother must be advised and understand that abortion is a procedure to achieve a non-medical objective: terminating

*Noem*, ECF No. 266-7.

[86] *See* Giebink, MD Decl., *PPMNS v. Daugaard*, ECF No. 232 (concluding that "there was no true doctor-patient relationship" (¶ 32) and testifying about the lack of an informed consent process at PPMNS's Sioux Falls, SD abortion facility, especially, ¶¶ 23–32).

her relationship with her child. The rights she will give up must be discussed with her to determine if she wants to waive them.

110. The mother must understand that abortion terminates the life of a whole, separate, unique, living human being. This is an established scientific fact PPMNS/PPNCS withholds from her.[87]

111. Many mothers want to know whether their child is already in existence. They ask questions like "What's there?" or "Is my baby already there?" PPMNS deliberately deceives mothers by telling them what is removed "is nothing but tissue," or "products of conception."[88]

112. South Dakota's 2005 Informed Consent Statute required PPMNS to disclose:

> That the abortion will terminate the life of a whole, separate, unique, living human being [the term "human being" defined in the biological sense under §34-23A-1(4)];
>
> That the pregnant woman has an existing relationship with that unborn human being and that the relationship enjoys protection under the United States Constitution and under the laws of South Dakota;[89]

---

[87] *See PPMNS v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (en banc); *PPMNS v. Rounds*, 650 F. Supp. 2d 972, 976-77 (D.S.D. 2009); *PPMNS v. Rounds*, 653 F.3d 662, 667 (8th Cir. 2011) (noting that the 8th Circuit, en banc, had already decided the matter, citing *Rounds*, 530 F.3d at 735).

[88] *See* Task Force Report, at 14-19, *PPMNS v. Noem*, ECF No. 267-51 (regarding PPMNS's unprofessional, destructive, and deceptive practices); Deposition of Miriam McCreary, MD, Feb. 1, 2006, at 76:11 - 77:17, Cassidy Third Decl., ECF No. 267-71; *see also, e.g.*, *Women's Life Care Center v. Ellison*, Neyer Decl., ¶¶ 9–21, ECF No. 105; Rodriguez First Decl., ¶ 20, ECF No. 103 (regarding similar practices at other Planned Parenthood affiliates).

[89] Like Minnesota, South Dakota makes killing an unborn child any time after conception a homicide punishable by life imprisonment. In South Dakota, negligent death of an unborn child at any time after conception is actionable as wrongful death.

> That by having an abortion, her existing relationship and her existing constitutional rights with regards to that relationship will be terminated.[90]

113. PPMNS sued, claiming the Human Being and Relationship Disclosures violated its free-speech rights.[91] PPMNS and its abortion doctors did not want to disclose those facts.

114. PPMNS knew that the Human Being Disclosure was a truthful and accurate statement of scientific fact. PPMNS knew it was asking a mother for permission to kill a human being – her child – thereby authorizing murder, and that her consent would immunize abortion doctors and workers. Despite this knowledge, PPMNS never made disclosures necessary for a mother to understand the nature of abortion.

115. The three required disclosures (as well as others) were true statements of fact, not misleading, and relevant to the mother's decision. PPMNS was ordered to make the Human Being Disclosure using the statute's precise language.[92]

116. For as long as PPMNS continued to perform abortions in South Dakota, it refused to make those disclosures, at PPFA's direction.[93]

117. To fully understand the nature of her consent, the mother must understand the effect of waiving her rights and consenting to termination of the life of her child. She

---

[90] S.D. Codified Laws §§ 34-23A-10.1(1)(b), -10.1(1)(c), -10.1(1)(d) (2005).

[91] *Rounds*, 530 F.3d 724 (8th Cir. 2008) (en banc); *Rounds*, 650 F. Supp. 2d 972 (D.S.D. 2009); *Rounds*, 653 F.3d 662 (8th Cir. 2011); *Rounds*, 686 F.3d 889 (8th Cir. 2012) (en banc).

[92] *Rounds,* 530 F.3d 724; *Rounds,* 650 F. Supp. 2d at 976-77; *Rounds*, 653 F.3d 662; *Rounds*, 686 F.3d 889.

[93] *See* S.D. Codified Laws § 34-23A–88 (2018).

must be advised and understand that killing her unborn child, at any age after conception, is murder punishable by mandatory life imprisonment, and that her signed consent immunizes the abortion providers from prosecution.

118. PPMNS/PPNCS never informs mothers of their constitutional rights. It never tells them that consent to abortion involves waiving those rights. It never tells them that their existing relationship with their child is being terminated by killing a whole, separate, unique, living human being. It never tells them that killing their child is murder punishable by mandatory life imprisonment, or that the only thing immunizing abortion doctors, nurses, and workers from murder prosecution is the signature they solicit from her.

119. The second set of facts PPMNS/PPNCS refuses to provide is where mothers can obtain help to keep the children they want. That information is critical.

120. Many pregnant mothers want their child but lack the support and assistance they need. PPMNS/PPNCS forbids workers from advising mothers how to obtain assistance to keep their children, even when the mothers ask. Former workers at Minnesota PPMNS/PPNCS facilities testify that PPMNS/PPNCS prohibits workers from telling mothers where they can get help to keep their child.[94]

121. PPMNS/PPNCS St. Paul facility workers discussed the reality "that a large percentage of pregnant mothers who had abortions at PPMNS would have preferred to keep

---

[94] *See, e.g.*, *Women's Life Care Center v. Ellison*, Declaration of C.M., ¶ 28 (D. Minn. Nov. 30, 2023), ECF No. 98; Declaration of Chastity Fyksen Ladoucer, ¶¶ 1–14 (D. Minn. May 26, 2024), ECF No. 101.

their child but needed some financial or other help. PPMNS never gave any information about where that help was available. PPMNS just gave them abortions."[95]

122. Pregnant mothers who lost their children at PPMNS/PPNCS abortion facilities provide common testimony: PPMNS/PPNCS provided no counseling, no information, and no informed consent process.[96] All of these failures are at PPFA's direction and supervision.

### 3. PPMNS/PPNCS/PPFA's Actual Knowledge of Its Violations of Mothers' Rights

123. In lawsuits where PPMNS/PPNCS was a party, women subjected to coerced or pressured abortions at PPMNS/PPNCS facilities have filed sworn testimony about their experiences.[97] PMNS/PPNCS and PPFA have known for years of these and other women whose rights they violated.

124. Until approximately 2020, PPMNS operated abortion facilities in Minnesota, North Dakota, and South Dakota. PPMNS knew all three states had laws making the killing

---

[95] C.M. Decl., ¶ 28, *Women's Life Care Center v. Ellison*, ECF No. 98.

[96] *See, e.g.*, Declaration of Tanya Humphreys, ¶¶ 30–31; *Women's Life Care Center v. Ellison* (D. Minn. Aug. 28, 2023), ECF No. 72; *PPMNS v. Daugaard/Noem,* S.C. Decl., ¶¶ 8, 12, ECF No. 208 (an abortion was started on S.C. and she hadn't even decided to have one); B.H. Decl., ¶¶ 14, 18, ECF No. 206; L.M. Decl., ¶¶ 17–21, ECF No. 302; Weston Decl., ¶¶ 26–27, 29, ECF No. 207.

[97] *See, e.g.*, *PPMNS v. Daugaard/Noem*, L.M. Decl., ECF No. 302; B.H. Decl., ECF No. 206; Carlson Decl., ECF No. 209; Declarations of Brittany (Wilson) Weston, *PPMNS v. Rounds* (D.S.D. May 18, 2006), ECF No. 119, and *PPMNS v. Daugaard* (D.S.D Dec. 16, 2019), ECF No. 207; *see also* S.C. Decl., ECF No. 208.

of an unborn human being at any age after conception a murder or homicide, with mandatory life imprisonment in Minnesota and South Dakota.[98]

125. PPMNS and PPFA's egregious policies revealed in the 2005 Informed Consent lawsuit led South Dakota to pass a 2011 Anti-Coercion Statute. The legislature made factual findings that PPMNS performed abortions without determining "whether the pregnant mother's decision is truly voluntary, uncoerced, and informed," and failed to screen for factors that place the mother at risk for psychological injury.[99] The 2011 statute required PPMNS physicians to meet with mothers and make required disclosures before scheduling an abortion, which could not be scheduled until 72 hours later.[100] Again, PPMNS and PPFA opposed protecting the mothers' rights.[101]

126. In 2018, South Dakota amended its Anti-Coercion Statute to further protect mothers from PPMNS's intentional destruction of their rights. The legislature set forth factual findings concerning PPMNS's derelictions in failing to make necessary disclosures, including PPMNS's refusal to make the Human Being Disclosure.[102] The evidence from two lawsuits, PPMNS's documented violations of federal court orders, and its disregard for mothers' rights led the South Dakota Legislature to conclude:

> [t]he Legislature finds that the physicians, agents, and employees who perform or assist in the performance of abortions at the Planned Parenthood facility in Sioux Falls, South Dakota have proven to be unreliable providers and

[98] *See* Minn. Stat. §§ 609.2661, 609.266 (2024); S.D. Codified Laws §§ 22-16-1.1, 22-6-1 (2025); N.D. Cent. Code §§ 12.1-17.1-01, 12.1-17.1-02, 12.1-32-01 (2025).
[99] S.D. Codified Laws § 34-23A-54(2) (2011).
[100] *Id*. § 34-23A-56 (2011).
[101] *PPMNS v. Daugaard/Noem*, 411-cv-4071-KES.
[102] S.D. Codified Laws §§ 34-23A-74 to -88 (especially, -81, -88) (2018).

> counselors of disclosures required by subsections 34-23A-10.1(1)(b) [Human Being Disclosure], (c), (d) [Relationship Disclosures] and (e)(ii) [Suicide Disclosure], such that it is in the interests of the pregnant mothers that [those] disclosures ... [be] provided by registered pregnancy help centers...[103]

127. PPMNS and PPFA are aware that former workers at PPMNS and other Planned Parenthood affiliates testified that Planned Parenthood facilities manipulate and pressure pregnant mothers to submit to abortions.[104] The State of Minnesota, its courts and state officials, have long been aware of all of PPMNS/PPNCS's derelictions and violations of the rights of pregnant mothers. Despite that knowledge, the state officials and its constitution delegate the termination of the mothers' rights and relationships to PPMNS/PPNCS and aid them to do so.

128. PPMNS/PPNCS and PPFA have long known that Planned Parenthood workers across the nation have suffered serious psychological harm caused by their realization that they were involved in the destruction of women's rights and lives. PPMNS/PPNCS and PPFA have known for years that hundreds of former workers sought psychological help from "And Then There Were None" because of the violations of mothers' rights they witnessed.[105]

---

[103] *Id*. § 34-23A-88 (2018).

[104] *See, e.g.*, *PPMNS v. Daugaard*, Thayer Decl., ECF No. 210; Declaration of Ramona Trevino (D.S.D. Aug. 10, 2019), ECF No. 213; Giebink, MD Decl., ECF No. 232; Abby Johnson Decl., ECF No. 211; Lancaster Decl., ECF No. 212; Declaration of Noemi Padilla (D.S.D. Mar. 18, 2019), ECF No. 216.

[105] *See, e.g.*, *PPMNS v. Daugaard*, Declarations of Abby Johnson (D.S.D. June 17, 2011), ECF No. 40-6 and (D.S.D. Nov. 22, 2019), ECF No. 211.

### B. PPMNS/PPNCS/PPFA's Actual Knowledge That Its Destruction of the Pregnant Mothers' Rights Subjects Them to Significant Risk of Psychological Harm

129. PPMNS Medical Director Dr. Ball admitted there are six risk factors, universally recognized by the abortion industry, placing a pregnant mother at increased risk for psychological harm post abortion: (1) being coerced into abortion; (2) being pressured into abortion; (3) abortion conflicts with the mother's moral or religious values; (4) the mother is ambivalent; (5) finds the decision difficult and distressing; and (6) prefers to continue her pregnancy.[106] Most pregnant mothers have one or more of these risk factors.

130. PPMNS abortion doctor Dr. Moore testified that a pregnant mother with any of those risk factors is at increased risk for depression, self-harm, sadness, post-traumatic stress disorder, suicide ideation, and suicide.[107]

131. PPMNS/PPNCS has known for decades that a mother with any of those six risk factors is at increased risk of serious psychological harm, including suicide ideation and death by suicide. Despite that knowledge, PPMNS/PPNCS performs abortions without screening for any of those risk factors. It never discusses them with mothers. In fact, PPMNS/PPNCS tries to convince mothers who have those risk factors to submit to abortion anyway.

[106] Dr. Ball Dep., Mar. 14, 2014, at 177:5 - 179:13, Cassidy First Decl., *PPMNS v. Noem* (D.S.D. Mar. 10, 2020), ECF No. 266-9.

[107] Dr. Moore Dep., May 16, 2014, at 130:4 - 133:17, Cassidy First Decl., *PPMNS v. Noem*, ECF No. 266-10.

132. Despite its knowledge, PPMNS claimed in *Rounds* that South Dakota's Suicide Disclosure violated abortion doctors' constitutional free-speech rights. The disclosure stated that an abortion placed a "pregnant woman" at "[i]ncreased risk of suicide ideation and suicide" (S.D. Codified Laws § 34-23A-10.1(1)(e)(ii)). PPMNS lied and claimed that the Suicide Disclosure was false, misleading, and irrelevant to the mother's decision. The 8th Circuit, en banc, held the Suicide Disclosure was truthful and relevant, and required PPMNS to make the disclosure before taking a mother's waiver.[108] In 2018, the South Dakota Legislature concluded that PPMNS continued to refuse to provide the Suicide Disclosure.[109]

133. PPMNS uses its pre-termination "counseling" to overcome women's moral or religious beliefs that conflict with abortion. To manipulate these women, PPMNS/PPNCS and PPFA provide personnel with training materials that explain how to convince a devout Christian woman that submitting to abortion is morally and religiously acceptable, despite her religion.[110]

134. PPMNS doctors Ball and Moore acknowledged they do not believe in God, but claim it is proper for an atheist to counsel a devout Christian woman about her religious beliefs when she believes an abortion violates her church's teaching.[111]

---

[108] *Rounds*, 686 F.3d 889 (8th Cir. 2012) (en banc).

[109] S.D. Codified Laws § 34-23A-88 (2018).

[110] Dr. Ball Dep., Mar. 14, 2014, at 146:25 - 147:16, Second Declaration of Harold J. Cassidy, Ex. 1, *PPMNS v. Noem* (D.S.D. Mar. 11, 2020) (submitted under seal); *see* Abby Johnson Decl., ¶¶ 9, 23, *PPMNS v. Daugaard*, ECF No. 211.

[111] Dr. Ball Dep., Mar. 14, 2014, at 150:19 -152:5 (Ex. 11) and Dr. Moore Dep., May 16, 2014, at 156:14 - 158:25 (Ex. 12), Cassidy First Decl., *PPMNS v. Noem*, ECF Nos. 266-11 and 266-12.

135. "Consortium of Abortion Providers" training material, which PPFA requires affiliates to use, includes content about overcoming women's religious objections to abortion.[112] Former managers testify that Planned Parenthood trains workers to overcome a mother's religious objections to abortion.[113] This places mothers at increased risk for psychological harm, as Doctors Ball and Moore acknowledged.

136. PPMNS/PPNCS follows the national model promulgated by PPFA which pressures pregnant mothers into submitting to abortions that violate their religious and moral beliefs, and which PPMNS/PPNCS admits, subjects mothers to the increased risk of suicide ideation and suicide.

137. PPMNS, PPNCS, and PPFA are aware that women subjected to abortions at their facilities have testified about suffering from recurring nightmares[114] and their deep psychological suffering, suicidal ideation, and suicide attempts.[115]

## IV. Unworkability of Delegation Without Court Proceedings and Due Process Protections

138. A mother's intrinsic right to keep her relationship with her child is one of the greatest rights she will have in all of life. That relationship brings great joy, happiness, and

[112] Abby Johnson Decl., ¶¶ 9, 23, *PPMNS v. Daugaard*, ECF No. 211.

[113] *See, e.g.*, *PPMNS v. Daugaard*, Thayer Decl., ECF No. 210; Lancaster Decl., ¶ 11, ECF No. 212; Abby Johnson Decl., ¶ 23, ECF No. 211.

[114] *See, e.g.*, *PPMNS v. Daugaard*, B.H. Decl., ¶¶ 2–3, 24, 27, ECF No. 206; Carlson Decl., ¶ 13, ECF No. 209; Ayers Decl., ¶ 38, ECF No. 218.

[115] *See, e.g.*, *PPMNS v. Daugaard/Noem*, Weston Decl., ¶¶ 42, 44–45, ECF No. 207; B.H. Decl., ¶¶ 20, 23, 25–27, ECF No. 206; L.M. Decl., ¶¶ 26–27, ECF No. 302; Ayers Decl., ¶¶ 34–36, 39–41, ECF No. 218; Carlson Decl., ¶¶ 2, 10, 12, 14, ECF No. 209; S.C. Decl., ¶ 22, ECF No. 208.

fulfillment. To protect that relationship, Minnesota makes it murder to terminate the mother's relationship by killing her child. Mandatory life imprisonment is the punishment.

139. Terminating parental rights has traditionally been an exclusive state function, in both involuntary and voluntary contexts. Traditionally, only a court of law can terminate that fundamental right, and only after a hearing meeting 14th Amendment Due Process requirements. However, Minnesota, under the guise that such terminations are "voluntary," delegates the state function of terminating a mother's relationship to private parties, if they are licensed to practice medicine or nursing. Abortion facilities and their doctors have financial, ideological, and political interests conflicting with the mothers' rights and interests. Minnesota provides no Due Process protections. As a result, every woman subjected to abortion at a Minnesota PPMNS/PPNCS facility has had her 14th Amendment rights violated. Not a single pregnant mother has been documented to have knowingly waived her parental rights and made a voluntary and informed decision to terminate her relationship with her child by terminating her child's life.

140. "Few forms of state action are both so severe and so irreversible" as state authorization of terminating a mother's parental rights.[116] The Court made that observation in the context of a court order which allowed appeal of an erroneous termination judgment.[117] Here, the act of defendant abortion business state actors, – termination by an abortion doctor or nurse – is totally irreversible. It is not subject to appeal. No mechanism of termination is more severe than that imposed by killing the mother's child. *Santosky*

---

[116] *Santosky v. Kramer*, 455 U.S. 745, 759 (1982) (emphasis added).
[117] *Id.* at 759.

also observed that the mother's right to her relationship with her child is "far more precious than any property right." The process of terminating her relationship "seeks not merely to infringe that fundamental liberty interest, but to end it."[118]

141. The state and its courts are duty bound to "'indulge every reasonable presumption against waiver' of fundamental constitutional rights." The courts "'do not presume acquiescence in the loss of fundamental rights.'"[119] Here, however, the State delegates the taking of such a waiver to PPMNS/PPNCS, its abortion doctors and workers, and PPMNS/PPNCS and the State presume the opposite – that the mother decided to waive her rights before she arrives at one of its facilities. They presume no need for any true counseling or protection of her rights.

142. Abortion is an unworkable method of terminating a mother's parental rights. Waiver of a pregnant mother's intrinsic constitutional rights and the termination of her relationship with her child cannot be delegated to abortion businesses consistent with the mother's 14th Amendment rights.[120]

---

[118] *Id.* at 758, 758–59 (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)).

[119] *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (quoting *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937), and *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n*, 301 U.S. 292, 307 (1937)).

[120] *See* Task Force Report, at 55-56, *PPMNS v. Noem*, ECF No. 267-51 (listing seven reasons why it is unworkable for a state to delegate to an abortion facility the acceptance of the mother's waiver and termination of her relationship).

## V. PPMNS/PPNCS/PPFA's Violations of the 14th Amendment Rights and Interests of Plaintiffs and Putative Class Representatives Boyer and KPS

### A. Clara Munger Boyer

143. Plaintiff Clara Munger Boyer is a lifelong Minnesota resident.

144. On November 26, 2021, PPMNS/PPNCS performed an unwanted medical abortion on Clara at its Brooklyn Park, Minnesota facility. Clara was 21 years old. Clara's baby was approximately seven to eight weeks old.

145. At the time of her pregnancy, Clara was unmarried and living with her parents.

146. When Clara discovered she was pregnant, she was surprised and scared. She had never imagined being pregnant without being married. She felt ashamed, embarrassed, and confused.

147. When Clara first told the baby's father she was pregnant, he suggested an abortion. Several days later, when they next discussed her pregnancy, he again suggested abortion. If the baby's father had supported Clara in keeping the baby, she never would have considered abortion.

148. Clara was experiencing so much stress that her decision-making capability was badly compromised. She felt unable to "think straight."

149. Clara believed abortion was morally wrong but felt trapped by her circumstances. She felt confused by the pervasive cultural narrative promoting abortion as a "sacred" constitutional right.

150. Toward the end of November 2021, Clara and the baby's father called PPMNS/PPNCS's Rochester, Minnesota facility, which scheduled the abortion to be performed at PPMNS/PPNCS's Brooklyn Park, Minnesota facility on November 26, 2021.

151. When Clara arrived at its Brooklyn Park abortion facility, PPMNS/PPNCS instructed her to sign the "consent" form while in the waiting room before she met with a doctor, nurse, or "counselor."

152. The abortion facility doctors, nurses, and workers did not engage in any informed consent process and provided no counseling. There was no discussion about the nature of the abortion procedure – that the abortion would permanently terminate her relationship with her child by terminating the life of her child, an existing human being.

153. PPMNS/PPNCS did not screen Clara for coercion, pressure, or risk factors for psychological harm. PPMNS/PPNCS did not discuss Clara's moral and religious objections to abortion. It provided no counseling.

154. If Clara had been properly advised that abortion would terminate her relationship with her child by terminating the life of a whole, separate, unique, living human being, she would not have submitted to the abortion. Clara did not know that an abortion killed an existing human being. If she was told that the killing of a child in utero was a murder punishable by life imprisonment, she never would have signed a "consent" for an abortion.

155. If Clara had been properly advised that the abortion doctors and nurses would be immunized from prosecution under the Minnesota murder statute solely because PPMNS/PPNCS secured her signature on a "consent" form, she would not have submitted

to the abortion. Clara's waiver of her rights and "consent" to the abortion was not knowing and informed, and were not voluntary in the true sense.

156. Clara's abortion, which she did not want and which wrongfully deprived her of her 14th Amendment rights and interests, has caused her to suffer extreme mental and emotional anguish, including extreme shame and sadness, depression, anger, remorse, and daily psychological rumination over the loss of her baby.

157. PPMNS/PPNCS knowingly deprived Clara of her 14th Amendment rights and interests. It acted with reckless indifference and callous disregard.

158. At all times relevant, PPMNS/PPNCS's practices, policies, protocols, and disclosure forms were dictated, developed, and controlled by PPFA and expressly authorized by Minnesota law and state officials. PPF acted under the color of Minnesota law within the meaning of 42 U.S.C. §1983.

159. Clara is entitled to significant compensable damages for the wrongful termination of her parental relationship with her child, and deprivation of her 14th Amendment fundamental rights to keep and maintain her relationship with her child and to procreate, independent of any potential claim for actual physical and psychological injuries. No claim is made in this case for compensatory damages for physical or psychological injury.

**B. KPS**

160. KPS resides in Minnesota.

161. On September 21, 2020, KPS was pressured into submitting to an unwanted surgical abortion performed at PPMNS/PPNCS's St. Paul, Minnesota facility. At the time, KPS lived in Minnesota, was unmarried and worked as a nursing assistant.

162. When KPS realized she was pregnant, she intended to keep and raise her child. She immediately sought prenatal care from an obstetrician. The obstetrician shocked her by suggesting abortion and providing her with a list of abortion facilities.

163. KPS's mother insisted that she submit to an abortion.

164. The father of KPS's child also demanded she have an abortion. He refused to take any responsibility for the child or provide any financial or emotional support to KPS.

165. KPS's mother and the baby's father continued to pressure her to abort. Despite the pressure being exerted upon her and the stress caused by the prospect of raising her child without any support, KPS was determined to take care of her baby on her own.

166. Over time, however, KPS was overwhelmed by the mounting pressure, stress of her circumstances, and lack of support, so she telephoned PPMNS/PPNCS's St. Paul facility, which scheduled an abortion.

167. When KPS arrived at PPMNS/PPNCS's St. Paul facility on the day of her scheduled appointment, she could feel her baby kicking. She began to cry and sob. PPMNS/PPNCS workers saw KPS's distress but did nothing to help her. She fled the facility without submitting to the abortion.

168. KPS's deep reluctance to have an abortion and her natural instinct to nurture and protect her baby resulted in a cycle of scheduling three additional appointments which she decided not to attend, and effectively cancelled. KPS wanted to keep her child but felt pressured to submit to the abortion. She was so conflicted and ambivalent that she scheduled and intentionally missed three subsequent abortion appointments.

169. Although she did not want an abortion, KPS ultimately succumbed to the pressure, stress, and confusion she had been experiencing for weeks. She contacted PPMNS/PPNCS for a fifth time, which again scheduled an abortion.

170. At one point during KPS's interactions with PPMNS/PPNCS, when her baby was approximately 20-22 weeks old, a PPMNS/PPNCS worker read a script to her by telephone. There was no discussion about the script. The worker didn't answer any of KPS's questions, except one. KPS asked if her baby would feel pain in the abortion. The worker lied and told KPS that what was being removed was "nothing but tissue."

171. When KPS arrived at PPMNS/PPNCS's St. Paul abortion facility for her fifth scheduled appointment, PPMNS/PPNCS required her to sign the "consent" while she was in the waiting room, before speaking with a doctor, nurse, or "counselor." PPMNS/PPNCS did not engage in any informed consent process. It provided no counseling. There was no discussion about the nature of the abortion procedure – that the abortion would permanently terminate her relationship with her child by terminating the life of her child, an existing human being.

172. PPMNS/PPNCS performed an ultrasound but did not allow KPS to see the screen despite her request. PPMNS/PPNCS did not tell her the age of her baby.

173. After the ultrasound, a worker gave KPS an oral drug. PPMNS/PPNCS did not explain the drug's purpose or effect. After swallowing the pill, KPS told workers she did not want to proceed with the abortion and wanted to leave. PPMNS/PPNCS told KPS that because she had already taken the drug, it was "too late."

174. KPS was crying when she was taken into the procedure room. Nobody from PPMNS/PPNCS asked her why she was so distressed. Instead, she was given medication that knocked her out.

175. When KPS regained full consciousness after the abortion, she asked to see her baby. PPMNS/PPNCS presented KPS with her child's dismembered remains in a metal pan. KPS saw her dismembered baby's head and other body parts. She could not stop crying.

176. Before she left the PPMNS/PPNCS facility, KPS requested her baby's remains for proper burial. She was advised the remains could be released only after she paid a funeral parlor. Within several days, KPS paid the money and her baby's remains were released to her. KPS had her baby buried.

177. PPMNS/PPNCS failed to screen KPS for coercion, pressure from others, or any other risk factor placing her at increased risk for post-abortion psychological harm. Proper screening would have revealed KPS was being pressured to undergo an abortion she did not want. PPMNS/PPNCS withheld counseling and discussion of material facts KPS needed.

178. If KPS had been properly advised that the abortion would terminate her relationship with her child by terminating the life of a whole, separate, unique, living human being, she would not have submitted to the abortion.

179. If KPS had been properly advised that the killing of a child in utero at any age after conception was a murder punishable by life imprisonment, and that the abortion doctors and nurses would be immunized from prosecution under the Minnesota murder statute solely because PPMNS/PPNCS secured her signature on a "consent" form, she would not have signed a "consent" or submit to the abortion.

180. KPS's abortion, which she did not want and which wrongfully deprived her of her 14th Amendment rights and interests, has caused her to suffer extreme mental and emotional anguish, including guilt, depression, remorse, and frequent crying spells. KPS also suffered from frequent nightmares and flashbacks where she relived the trauma of her abortion experience and seeing the remains of her disremembered baby.

181. PPMNS/PPNCS knowingly deprived KPS of her 14th Amendment rights and interests. It acted with reckless indifference and callous disregard.

182. At all times relevant, PPMNS/PPNCS's practices, policies, protocols, and disclosure forms were dictated, developed, and controlled by PPFA.

183. KPS is entitled to significant compensable damages for the wrongful deprivation of her 14th Amendment fundamental rights to keep and maintain her relationship with her child and to procreate, independent of any potential claim for actual physical or psychological injuries. No claim is made in this case for compensatory damages for physical or psychological injuries.

## CLASS ALLEGATIONS

184. Plaintiffs file this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and others similarly situated. Putative class members are similarly situated.

185. Plaintiffs seek to certify a single Class, defined as:

> All pregnant mothers who were subjected to an abortion in Minnesota by Planned Parenthood Minnesota, North Dakota, South Dakota (PPMNS), Planned Parenthood North Central States (PPNCS), and PPFA within the last six years. The Class includes all women subjected to surgical abortions at a PPMNS/PPNCS facility in Minnesota and all women subjected to a medical abortion initiated at a PPMNS/PPNCS facility in Minnesota which resulted in the death of the mother's child.[121]

186. All class members sustained injury resulting from Defendants' knowing and wrongful deprivation of their 14th Amendment rights and interests, and the wrongful termination of their parental relationship with their child. No class member received the Due Process protections of their rights and interests required by the 14th Amendment. Each class member is entitled to significant compensatory damages for the wrongful deprivation of her 14th Amendment fundamental right to keep and maintain her relationship with her child and right to procreate, independent of any potential claim for actual physical or psychological injuries. Class members are entitled to an award of punitive damages for Defendants' PPFA, PPMNS, PPNCS, and Traxler's acts performed with reckless indifference and callous and deliberate disregard of the rights of pregnant

[121] Minnesota DOH statistics report all women who initiated the medical abortion process as having had an abortion, although outcomes are generally unknown.

mothers. Defendants at all times knew they were violating the constitutional rights of the pregnant mothers.

## I. Ascertainability

187. The Minnesota Department of Health publishes the annual number of abortions by facility. It identifies PPMNS/PPNCS as Planned Parenthood of Minnesota.[122] The most recent available annual report is for 2024, with no published reports for 2025 and 2026. By the DOH's count, 33,431 women were subjected to abortions at PPMNS/PPNCS facilities between July of 2020 and December of 2024. Using numbers averaged from the three prior years, approximately 11,343 pregnant mothers were subjected to abortions at PPMNS/PPNCS facilities in 2025 and first six months of 2026. This totals 44,774 class members. Each can be individually identified by PPMNS/PPNCS's business records.

188. Class members are adequately defined, readily identifiable, and clearly ascertainable by an objective standard. *Sandusky Wellness Ctr., L.L.C. v. Medtox Sci., Inc.*, 821 F.3d 992, 996 (8th Cir. 2016).

189. Excluded from the Class are Defendants' legal representatives, officers, directors, assigns, successors, employees, and agents (and members of their immediate families), and the governmental and judicial officers to whom this case is assigned and their staff (and members of their immediate families).

---

[122] Minn. Dept. of Health, *Induced Abortion in Minnesota: Annual Reports to the Minnesota Legislature* (2020–2024), https://www.health.state.mn.us/data/mchs/pubs/abrpt/index.html.

190. This Court may maintain these claims as a class action pursuant to Fed. R. Civ. P. 23(a); 23(b)(1)(B); and/or 23(b)(3).

## II. Prerequisites

### A. Numerosity

191. "[T]he class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Approximately 44,774 pregnant mothers were subjected to abortions at a PPMNS/PPNCS facility within the last six years (within the applicable statute of limitations). Each class member can be individually identified by PPMNS/PPNCS's business records. The number of class members exceeds the number that reasonably allows joinder, so it satisfies Fed. R. Civ. P. 23(a)(1).

### B. Commonality

192. "[T]here are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Common questions and facts include, but are not limited to:

a) Whether pregnant mothers possess 14th Amendment rights to maintain their parental relationship and to procreate, and a protected interest in their child's welfare;

b) Whether Minnesota's abortion laws, dictated by its state constitution, violate the 14th Amendment by permitting termination of parental rights without procedural safeguards ensuring knowing, voluntary, and informed waiver and consent;

c) What minimum Due Process protections the 14th Amendment requires before a state may authorize private parties to accept a pregnant mother's waiver of her parental rights and interests and her consent to the termination of her relationship by the termination of her child's life;

d) Whether PPMNS/PPNCS, and PPFA are "state actors" acting "under the color of state law" subject to liability under 42 U.S.C. § 1983;

e) Whether Plaintiffs are entitled to a declaratory judgment that PPMNS/PPNCS and PPFA's implementation of Minnesota's abortion laws violates pregnant mothers' Due Process and Equal Protection rights, and the equal protection rights of their child;

f) The fact that each of the class members have the same loss: the compensable loss of their relationship with their child;

g) Whether Plaintiffs are entitled to punitive damages.

193. Common questions of law and fact affect each class member's rights. All class members seek the same relief. Defendants injured each class member through the same conduct. Defendants violated the 14th Amendment rights of all class members, all of whom seek a declaratory judgment regarding that deprivation. These common questions permit classwide resolution: determining their truth or falsity resolves the issues "central to the validity of each one of the claims in one stroke." *Sandusky Wellness*, 821 F.3d at 998 (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011)).

**C. Typicality**

194. Plaintiffs' claims are typical of the Class claims. Fed. R. Civ. P. 23(a)(3). "Typicality is satisfied 'when the claims of the named plaintiffs emanate from the same event or are based on the same legal theory as the claims of the class members.'" *Lockwood Motors, Inc. v. Gen. Motors Corp.*, 162 F.R.D. 569, 575 (D. Minn. 1995) (quoting *In re Workers' Compensation,* 130 F.R.D. 99, 105 (D. Minn.1990) (quoting *Dirks v. Clayton Brokerage Co. of St. Louis, Inc.,* 105 F.R.D. 125, 132–33 (D. Minn. 1985)). Here, Plaintiffs and the Class base their claims on the same facts and legal theories. Defendants' same policies, procedures, and conduct injured each class member. Minnesota controlling

law that dictates and authorizes Defendant' conduct, and the aid Defendants receive from the state officials is identical for all class members. The principal issue in this case is straightforward: PPMNS/PPNCS and PPFA, state actors, terminated the pregnant mothers' parental rights and relationship without ensuring their waiver and consent were knowing, informed, and voluntary, thereby violating the mothers' 14th Amendment Equal Protection and Due Process rights. They did so, in every instance, under the authority delegated by the state, and with the aid of state officials.

**D. Adequacy**

195. Plaintiffs "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "[T]he representatives and their attorneys are able and willing to prosecute the action competently and vigorously and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 692 (D. Minn. 1995) (citing *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 268, 270 (D. Minn. 1989)). Plaintiffs Boyer and KPS have retained counsel with substantial experience litigating the 14th Amendment rights of pregnant mothers and prosecuting class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of class members and have the financial resources to do so. Neither Plaintiffs nor counsel has any interest adverse to class members' interests. Plaintiffs seek relief for injuries sustained under two distinct Minnesota abortion regimes: the first regime provided insufficient statutory protections that violated the 14th Amendment rights of pregnant mothers; the second regime followed *Doe*, when all protections of the mothers' rights were expressly prohibited

under Minnesota law. Under both regimes, pregnant mothers suffered the permanent termination of their parental relationships, violating their Due Process and Equal Protection rights. Plaintiffs Boyer and KPS share class members' interests, so their goals and viewpoints will remain aligned.

## III. Types of Class Actions

196. The Court can maintain the Class under Fed. R. Civ. P. 23(b)(1). Prosecuting separate actions by individual class members would create a risk of "adjudications with respect to individual class members that, as a practical matter, would be dipositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. R. Civ. P. 23(b)(1)(B). Common questions of law and fact affect each class member's rights. All class members seek the same relief. Defendants' same conduct injured each class member. Rulings on central issues in individual actions would be dispositive of other class members' interests.

197. The Class can also be maintained under Fed. R. Civ. P. 23(b)(3). Common questions of law and fact permit classwide resolution: determining their truth or falsity will resolve the issues "central to the validity of each one of the claims in one stroke." *Sandusky Wellness*, 821 F.3d at 998 (quoting *Wal-Mart,* 564 U.S. at 350).

198. Common questions of law and fact predominate over questions affecting only individual class members. Defendants' liability to all plaintiffs will "be established with common evidence … the same evidence will suffice for each member to make a prima

facie showing, [so] it becomes a common question." *Id.* (quoting *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1029 (8th Cir. 2010)).

199. A class action is superior to other available methods for fair and efficient adjudication under Fed. R. Civ. P. 23(b)(3). Without a class action, most class members would find the financial cost and emotional strain of litigation prohibitive. They would have no remedy at law. Class treatment of common questions conserves judicial and party resources. It promotes consistency and efficiency. Individual actions by each class member who has suffered harm would be impracticable and undesirable.

200. This action presents no unusual management difficulties as a class action.

## CLAIMS FOR RELIEF

### FIRST CLAIM

**Violation of the Pregnant Mother's Right to Keep and Maintain Her Parental Relationship with Her Child Guaranteed by the 14th Amendment**

201. Plaintiffs re-allege and incorporate by reference the facts and allegations in all preceding paragraphs as though fully set forth herein.

202. Minnesota's abortion laws[123] delegate to PPMNS/PPNCS and PPFA, the termination of a pregnant mother's parental relationship without requiring a court

[123] Plaintiffs seek relief for the violation of the pregnant mothers' rights and interests sustained both when Minnesota had some modest, insufficient statutory protections, and when all protections of the mothers' rights were prohibited following *Doe*.

proceeding or procedural safeguards to ensure the mother's waiver of her rights and consent to the termination of her relationship by the termination of her child's life is knowing, voluntary, and informed.

203. This delegation and its implementation by PPMNS/PPNCS, PPFA, and Traxler, acting under the color of Minnesota law, deprived Plaintiffs and class members of their 14th Amendment fundamental right to maintain their parental relationship with their child.

204. Minnesota has no legitimate state interest in terminating a mother's parental relationship when she wants to keep her child, when her consent to terminate is not voluntary, knowing, and informed, and such termination is not in the child's best interest.

**SECOND CLAIM**

**Violation of the Pregnant Mother's Right to Procreate Guaranteed by the 14th Amendment**

205. Plaintiffs re-allege and incorporate by reference the facts and allegations in all preceding paragraphs as though fully set forth herein.

206. Minnesota's abortion laws delegate to PPMNS/PPNCS and PPFA the power to solicit and take a pregnant mother's waiver of her right to procreate without requiring a court proceeding or procedural safeguards to ensure the mother's waiver of her rights and consent to the termination of her relationship by the termination of her child's life is knowing, voluntary, and informed.

207. This delegation and its implementation by PPMNS/PPNCS, PPFA, and Traxler, acting under the color of Minnesota law, deprived Plaintiffs and class members of their 14th Amendment fundamental right to procreate.

208. Minnesota has no legitimate state interest in depriving mothers of their right to procreate.

## THIRD CLAIM

### Violation of the Pregnant Mother's Constitutionally Protected Interest in Her Child's Life and Welfare

209. Plaintiffs re-allege and incorporate by reference the facts and allegations in all preceding paragraphs as though fully set forth herein.

210. Pregnant mothers possess an interest in their child's welfare protected by the 14th Amendment. That interest includes the mother's interest in her child's life and protecting her child's life. Minnesota's abortion laws delegate to PPMNS/PPNCS, Traxler, and PPFA the power to solicit and take the waiver of the pregnant mother's rights and the termination of her relationship with her child without requiring a court proceeding or procedural safeguards to ensure the mother's waiver of her interests and consent to the termination of her relationship by the termination of her child's life is knowing, voluntary, and informed.

211. This delegation and its implementation by PPMNS/PPNCS, PPFA, and Traxler, acting under the color of Minnesota law, deprived Plaintiffs and class members of their 14th Amendment interest in protecting their child's life and welfare.

212. Minnesota has no legitimate state interest in destroying the welfare of the mother's child or in killing a pregnant mother's child when the mother wants her child, or when her waiver of her rights and consent to an abortion is not knowing, voluntary, and informed.

## FOURTH CLAIM

### Violation of the Pregnant Mother's 14th Amendment Right to the Equal Protection of the Law – Minnesota Murder Statute

213. Plaintiffs re-allege and incorporate by reference the facts and allegations in all preceding paragraphs as though fully set forth herein.

214. Pregnant mothers have a 14th Amendment right to equal protection of the law. Minnesota's abortion laws, as implemented by PPMNS/PPNCS, PPFA, and Traxler, acting under color of state law, violate that right by denying pregnant mothers the equal protection of Minnesota's murder statute. Under that statute, intentionally killing an unborn child at any age after conception is murder, punishable by mandatory life imprisonment. Minn. Stat. §§ 609.2661, 609.266. The statute is intended to protect, through deterrence, a pregnant mother's right to keep and maintain her relationship with her child. *Merrill*, 450 N.W.2d at 322. But Minnesota law, as implemented by PPMNS/PPNCS, PPFA, and Traxler, denies that protection to pregnant mothers who appear at an abortion facility, even when the mother's waiver of rights is not knowing, voluntary, and informed, or her consent to the termination of her child's life is not voluntary and informed.

215. Defendants take no action to ensure that the mother's consent to the abortion – which results in the killing of her child – is fully voluntary and fully informed. PPMNS/PPNCS, PPFA, and Traxler proceed with abortions even when they know, or should know, that the pregnant mother wants to keep her child. Defendants accommodate involuntary abortions and mislead mothers into unknowing and uninformed waivers of their rights.

216. Minnesota's abortion laws immunize the abortion businesses, abortion doctors and nurses, and their employees and agents from prosecution under the Minnesota murder statute. The laws grant immunity solely based upon their possession of professional licenses and labeling the killing an "abortion," as long as they have a signature on a "consent" form, even when the killing is involuntary or completely uninformed.

217. This immunity encourages PPMNS/PPNCS, PPFA, and Traxler to maximize the number of abortions, without regard for the rights of pregnant mothers whose children are killed in an involuntary or uninformed abortion.

218. Minnesota's abortion laws, implemented by PPMNS/PPNCS, PPFA, and Traxler, acting under the color of Minnesota law, deprived Plaintiffs and class members of their 14th Amendment right to the equal protection of the Minnesota murder statute, Minn. Stat. §§ 609.2661, 609.266.

## FIFTH CLAIM

### Violation of the Pregnant Mother's 14th Amendment Right to the Equal Protection of the Law – Minnesota's Statutory Procedures and Protections for the Involuntary Termination of a Mother's Parental Rights

219. Plaintiffs re-allege and incorporate by reference the facts and allegations in all preceding paragraphs as though fully set forth herein.

220. Pregnant mothers possess the right to the equal protection of the law guaranteed by the 14th Amendment. The Minnesota abortion laws implemented by PPMNS/PPNCS, PPFA, and Traxler, acting under the color of state law, deny pregnant mothers the equal protection of Minnesota laws (Minn. Stat. §§ 260C.163, 260C.301, 260C.307) governing the involuntary termination of a mother's parental relationship and parental rights.

221. Minn. Stat. § 260C.301(1)(b) sets forth the grounds needed to be proven for an involuntary termination (based upon abuse or neglect) of a mother's parental relationship and parental rights. The statute protects the best interests of the mother's child. It does not authorize the destruction of the child's interests.

222. Minn. Stat. §§ 260C.307 and 260C.163 require the State to conduct a court hearing before involuntarily terminating the parental relationship between a mother and her child. The State must prove the grounds for termination by clear and convincing evidence. The State must provide the mother with full due process of law, including legal representation, the right to cross-examine witnesses, and the right to call witnesses on her

own behalf. The law requires these protections even for pregnant mothers threatened with state termination. *See J.W.*, 807 N.W.2d at 441.

223. By contrast, Minnesota's abortion laws deny pregnant mothers any hearing or due process before PPMNS/PPNCS, PPFA, and Traxler subject them to an involuntary termination of their parental rights by killing their child.

224. Minnesota's abortion laws, as implemented by PPMNS/PPNCS, PPFA, and Traxler, acting under the color of Minnesota law, deprived Plaintiffs and class members of their 14th Amendment right to the equal protection of Minn. Stat. § 260C.163, 260C.301, 260C.307 which require a full court hearing before involuntary termination of their parental relationship.

## SIXTH CLAIM

**Violation of the Pregnant Mother's 14th Amendment Right to the Equal Protection of the Law – Minnesota's Statutory Procedures and Protections for the "Voluntary" Termination of a Mother's Parental Rights and Relationship (Adoption)**

225. Plaintiffs re-allege and incorporate by reference the facts and allegations in all preceding paragraphs as though fully set forth herein.

226. Minnesota's abortion laws violate the pregnant mother's right to the equal protection of Minnesota's law governing the voluntary termination of a pregnant mother's rights and parental relationship with her child.

227. Minnesota law governs the voluntary termination of a pregnant mother's constitutionally protected relationship with her child to protect against involuntary or uninformed terminations. Minn. Stat. ch. 259. That law recognizes (1) persons other than

the pregnant mother with interests conflicting with the mother's interests may pressure her to terminate her relationship; (2) the pregnant mother's circumstances often place stress upon her and compromise her decision-making; and (3) the mother often has difficulty fully appreciating the nature and magnitude of what she is giving up by terminating her rights before her child's birth.

228. In the adoption context, Minnesota law protects the pregnant mother's right to make a fully knowing, voluntary, and informed decision about her waiver of such important constitutional rights:

(1) It does not permit, recognize, or enforce a document signed by the mother purporting to waive her parental rights at any time during pregnancy; the mother may sign a waiver only *after* her child is born and she has had the opportunity to see and hold her child;

(2) The pregnant mother is entitled to free pre-termination counseling to explore her feelings, desires, and what help is available if she prefers to keep her child;

(3) The pregnant mother is entitled to free legal counsel;

(4) After signing a waiver and relinquishment of her rights, the mother may revoke her waiver for any reason;

(5) Only a court of law can terminate the mother's parental rights, and only after conducting a hearing that determines the mother's waiver and consent to the termination of her rights and relationship is fully knowing, voluntary, and informed;

(6) No private entity can terminate the mother's relationship; and

(7) The mother has the right to appeal the termination of her rights if the State violated her rights by deviating from legal requirements.[124]

[124] *See* Minn. Stat. ch. 259 (2025).

229. Minnesota's abortion laws deny all these statutory protections of the pregnant mother's intrinsic 14th Amendment rights.

230. Minnesota's abortion laws deprived Plaintiffs and class members of their 14th Amendment right to the equal protection of the Minnesota law (Minn. Stat. ch. 259) which prohibits the taking of waivers of mothers' rights and termination of their parental relationship and parental rights prior to birth and without counseling, legal representation, and a hearing in a court of law to determine that such waiver and termination is truly knowing, voluntary, and informed. PPMNS/PPNCS, PPFA, and Traxler, acting under the color of Minnesota law, as state actors, violate the 14th Amendment rights of Plaintiffs and all class members.

## SEVENTH CLAIM

### Violation of the Pregnant Mother's 14th Amendment Right to the Equal Protection of the Law – Minnesota's Statutory Procedures and Protections for the "Voluntary" Termination of a Mother's Parental Rights and Relationship (Under State Investigation)

231. Plaintiffs re-allege and incorporate by reference the facts and allegations in all preceding paragraphs as though fully set forth herein.

232. Minnesota's abortion laws violate the pregnant mother's right to the equal protection of Minnesota's law governing the voluntary termination of a pregnant mother's rights and parental relationship with her child.

233. Minnesota law governs the voluntary waiver and termination of a mother's right to her parental relationship with her child when she is under state investigation for abuse or neglect. Minn. Stat. § 260C.301, subd. 1(a). All such terminations require the same court

hearing as required for involuntary terminations. *Id.*, subd. 1(b); *see* § 260C.163. The mother has a right: (1) to attend and participate in the hearing; (2) to be heard: (3) to effective legal counsel, including the right to have an attorney appointed when appropriate; and (4) to testify, present evidence, and cross-examine witnesses. § 260C.163, subds. 1-4, 8; *see* § 260C.301, subd. 1(b). The state must establish the voluntary basis for termination by clear and convincing evidence. § 260C.163, subd. 1(a).

234. When a mother consents to a voluntary termination, only a court of law can terminate her parental relationship and parental rights. She must be given a court hearing in which she unambiguously confirms her decision is voluntary and admits to conduct justifying termination of her rights. The court's determinations must be made by clear and convincing evidence. *D.F.*, 752 N.W.2d at 92. In addition, the court can stay the order terminating the mother's parental rights to give the mother a chance to correct her conduct and revoke her consent. *Id.*

235. By contrast, Minnesota's abortion laws, deny pregnant mothers any hearing or due process before Defendants subject them to a "voluntary" termination of their parental rights by killing their child.

236. Minnesota's abortion laws as implemented by PPMNS/PPNCS, PPFA, and Traxler, acting under the color of Minnesota law, deprived Plaintiffs and class members of their 14th Amendment right to the equal protection of the Minnesota laws which require a full hearing, pursuant to Minn. Stat. § 260C.163, before a court can terminate the mother's parental rights in a voluntary termination proceeding.

## EIGHTH CLAIM

**Violation of the Pregnant Mother's 14th Amendment Right to the Equal Protection of the Law – Minnesota's Statutory Procedures and Protections for the "Voluntary" Termination of a Mother's Parental Rights and Relationship in the Context of Terminations by Abortion**

237. Plaintiffs re-allege and incorporate by reference the facts and allegations in all preceding paragraphs as though fully set forth herein.

238. Minnesota's abortion laws violated the pregnant mother's right to the equal protection of Minnesota's law governing the voluntary termination of a pregnant mother's rights and parental relationship with her child.

239. Prior to *Doe*, at the time Plaintiffs Clara Boyer and KPS were subjected to abortions, Minnesota law extended court proceedings for some pregnant mothers to protect their rights and ensure the decision to submit to an abortion was their own voluntary decision to waive and terminate their rights. However, those protections were extended to some pregnant mothers but denied to others. *See* "Judicial Bypass Statute," Minn. Stat. § 144.343 (2022) (repealed 2023).[125] Under the previously existing statute by which a minor seeking an abortion could bypass the parental notification law, abortion providers were required to obtain court authorization before accepting a waiver of the mother's rights. That statute was an acknowledgment that in the context of abortion, a pregnant mother is often subjected to the undue influence of others whose interests and desires conflict with hers and who seek to pressure or coerce her and impose their will upon her.

[125] *Doe*, *supra* notes 11, 20, 25, 32, slip op. at 3, 22–25, 95–109.

That statute required the court to advise the pregnant mother that she has a right to have the court appoint her counsel, conduct "an appropriate hearing" to determine her true wishes, make specific findings of fact and conclusions of law, and make a permanent record of the proceeding.[126]

240. The Minnesota abortion laws which existed prior to *Doe*, and which were in effect when Plaintiffs Boyer and KPS were subjected to their unwanted abortions, denied most pregnant mothers any hearing or due process procedures to confirm that their abortions were truly voluntary and informed before PPMNS/PPNCS, PPFA, and Traxler subjected them to an alleged "voluntary" termination of their parental relationship and parental rights.

241. Until *Doe*, Minnesota provided to some pregnant mothers – but not to all pregnant mothers similarly situated – a court hearing to confirm their voluntary and informed consent to an abortion. Minnesota provided these protections only to mothers who ostensibly wanted to terminate their rights and relationship free of others' undue influence, but Minnesota denied protections to mothers who preferred to keep their children but were being subjected to coercion or pressure. The class of women similarly situated were all pregnant mothers at risk of being subjected to pressure, coercion, or under influence from others.

242. The Minnesota abortion laws, as implemented by PPMNS/PPNCS, PPFA, and Traxler, acting under the color of Minnesota law, deprived Plaintiffs and class members of their 14th Amendment rights by denying them the equal protection of the Minnesota laws

[126] Minn. Stat. § 144.343 (2022) (repealed 2023).

which required a hearing, pursuant to Minn. Stat. § 144.343, before a court could terminate the mother's parental rights in a voluntary termination proceeding.

## NINTH CLAIM

### Violation of the Pregnant Mother and Her Child's Mutual Right to the Equal Protection of the Law – Minnesota Murder Statute

243. Plaintiffs re-allege and incorporate by reference the facts and allegations in all preceding paragraphs as though fully set forth herein.

244. Minnesota's abortion laws violate the pregnant mother and her child's mutual right to the equal protection of Minnesota's murder statute.

245. Under Minnesota's murder statute, intentionally killing any unborn child at any age after conception is murder punishable by *mandatory* life imprisonment. Minn. Stat. §§ 609.2661, 609.266. The murder statute is intended to protect the pregnant mother's right to keep and maintain her relationship with her child, and to protect her child's life, through the deterrent effect of severe criminal punishment. *Merrill*, 450 N.W.2d at 322.

246. During pregnancy, the interests of the pregnant mother who wants her child and the interests of her child are more inextricably connected and innately compatible than in any other human relationship. At no time are the interests of two human beings more directly aligned.

247. When a pregnant mother wants her child and wants to keep her relationship, her interests and those of her child never conflict.

248. When a pregnant mother wants to keep her child, her child has a right to the equal protection of the Minnesota murder statute intended to protect the child's life. The

mother has a personal interest in her own rights, but she also has an interest in, and the legal standing to assert, her child's rights and interests.

249. When the rights of a human being in utero are not in conflict with the rights of her pregnant mother, the unborn child enjoys the equal protection of the law guaranteed by the 14th Amendment. The Equal Protection Clause forbids the State from discriminating against any class of human beings and cannot itself be read to exclude any particular class from its protection.

250. Minnesota's abortion laws, as implemented by PPMNS/PPNCS, PPFA, and Traxler, acting under the color of Minnesota law, deprived Plaintiffs, class members, and their children who were aborted, of their mutual 14th Amendment right to the equal protection of the Minnesota murder statute, Minn. Stat. §§ 609.2661, 609.266

## TENTH CLAIM

### Violation of the Pregnant Mother's 14th Amendment Right to Procedural Due Process of Law

251. Plaintiffs re-allege and incorporate by reference the facts and allegations in all preceding paragraphs as though fully set forth herein.

252. Pregnant mothers possess the right to the procedural due process of law guaranteed by the 14th Amendment. Minnesota's abortion laws violate the pregnant mothers' 14th Amendment right to procedural due process of law.

253. Minnesota's abortion laws terminate a pregnant mother's 14th Amendment fundamental rights to keep and maintain her relationship with her child and to procreate, and her protected interest in her child's welfare and life. The State acts under the guise that the

mother's waiver of these fundamental rights and interests is knowing and that her consent to their termination is informed and voluntary. The mothers' rights and interests are terminated without any court proceeding – or any other meaningful legal protection – to ensure her "waiver" is truly knowing, voluntary, and informed.

254. The State of Minnesota cannot circumvent the requirements imposed upon it by the 14th Amendment. It cannot evade the Constitution's guarantee of procedural due process of law by delegating to private entities the traditional exclusive state function of terminating the parental rights of pregnant mothers. Only the State, through its courts, can properly perform that function to ensure such waivers and terminations are knowing, voluntary, and informed. The state cannot delegate and authorize to a private party conduct it is forbidden to engage in itself.

255. Minnesota's abortion laws, as implemented by PPMNS/PPNCS, PPFA, and Traxler, acting under the color of Minnesota law, deprived Plaintiffs and class members of their 14th Amendment procedural due process rights by delegating terminations to private entities without any provisions to protect against a mother's unknowing waiver or involuntary or uninformed consent to terminating her parental rights and interests. The State makes this delegation to entities with financial and ideological interests adverse to those of the pregnant mothers. At PPMNS/PPNCS, there is no true medical care and no "patient-physician relationship," no screening for coercion or pressure by others, no disclosure or discussion about the nature or result of the abortion or about the mother's rights and interests, and no pre-termination counseling.

## PRAYERS FOR RELIEF

**WHEREFORE**, Plaintiffs Clara Munger Boyer and KPS, individually and on behalf of all others similarly situated, respectfully request that this Court enter orders and judgments against Defendants PPMNS, PPNCS, Sarah A. Traxler, MD, and PPFA, granting the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that Minnesota's abortion laws – both the pre-*Doe* statutory regime and the existing abortion laws following *Doe v. Minnesota* – as implemented by PPMNS, PPNCS, PPFA, and Traxler, acting under color of state law, violate the substantive Due Process rights of pregnant mothers guaranteed by the 14th Amendment, on their face and as applied, by delegating to private entities the traditional exclusive state function of terminating a pregnant mother's constitutionally protected parental relationship with her child without any court proceeding or other Due Process protections to ensure the mother's waiver of her rights and consent to terminating her relationship by the termination of her child's life are fully knowing, voluntary, and informed;

B. A declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that Minnesota's abortion laws, as implemented by PPMNS, PPNCS, PPFA, and Traxler, acting under color of state law, violate Plaintiffs' and class members' fundamental right to procreate guaranteed by the Fourteenth Amendment;

C. A declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that Minnesota's abortion laws, as implemented by PPMNS, PPNCS, PPFA, and Traxler, acting under color of state law, violate Plaintiffs' and class members' constitutionally protected interest in their child's life and welfare guaranteed by the Fourteenth Amendment;

D. A declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that Minnesota's abortion laws, as implemented by PPMNS, PPNCS, PPFA, and Traxler, acting under color of state law, violate Plaintiffs' and class members' Equal Protection rights guaranteed by the 14th Amendment by denying them the equal protection of:

(i) Minnesota's murder statute, Minn. Stat. §§ 609.2661, 609.266;

(ii) Minnesota's statutory procedures and protections for the involuntary termination of a mother's parental rights and relationship, Minn. Stat. §§ 260C.163, 260C.301, 260C.307;

(iii) Minnesota's statutory procedures and protections for the "voluntary" termination of a mother's parental rights and relationship in the adoption context, Minn. Stat. ch. 259; and

(iv) Minnesota's statutory procedures and protections for the "voluntary" termination of a mother's parental rights and relationship in the "judicial bypass" context, Minn. Stat. § 144.343.

E. A declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that Minnesota's abortion laws, as implemented by PPMNS, PPNCS, PPFA, and Traxler, acting under color of state law, violated the Equal Protection rights of Plaintiffs and class members – and their children – guaranteed by the 14th

Amendment by denying their mutual right to the equal protection of the Minnesota murder statute (Minn. Stat. §§ 609.2661, 609.266);

F. A declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, declaring that Minnesota's abortion laws, as implemented by PPMNS, PPNCS, PPFA, and Traxler, acting under color of state law, violate the procedural Due Process rights of Plaintiffs and class members guaranteed by the Fourteenth Amendment;

G. An award of compensatory damages against Defendants PPMNS, PPNCS, PPFA, and Traxler, pursuant to 42 U.S.C. § 1983, to Plaintiffs and each class member for their loss of their relationship with their child, and for the deprivation of their substantive 14th Amendment rights, including the right to keep and maintain their parental relationship with their child and the right to procreate.

H. An award of punitive damages, pursuant to 42 U.S.C. § 1983, against Defendants PPMNS, PPNCS, and PPFA, who acted with reckless disregard, callous indifference to Plaintiffs' and class members' constitutionally protected rights and interests, and with intent to wrongfully terminate the mothers' relationship with their child, and terminate their child's life, in an amount sufficient to punish Defendants and deter similar conduct in the future;

I. An order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(1)(B), 23(b)(2), and/or 23(b)(3), appointing Plaintiffs Clara Munger Boyer and KPS as Class representatives, and appointing (under Fed. R. Civ. P. 23(g)) Plaintiffs' counsel as Class counsel;

J. An award of reasonable attorneys' fees, expert fees, and costs of suit to Plaintiffs pursuant to 42 U.S.C. § 1988;

K. Pre-judgment and post-judgment interest as allowed by law; and

L. Such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: September 14, 2026

s/ Harold C. Knecht, III
Bar Number: 0283666
Attorney for Plaintiffs
20 Doral Road
Dellwood, MN 55110
Tel: (651) 303-9309
mallorygrp@comcast.net

THE CASSIDY LAW FIRM, LLC
Attorneys for Plaintiffs
Harold J. Cassidy*
Bar Number: 011831975
Joseph R. Zakhary*
Bar Number: 010302003
Derek M. Cassidy*
Bar Number: 041562007
Thomas J. Viggiano, III*
Bar Number: 044611997
750 Broad Street, Suite 3
Shrewsbury, NJ 07702
Tel: (732) 747-3999
hjc@haroldcassidy.com

Schaerr | Jaffe LLP
Gene Schaerr*
Bar Number: 416368
1717 K Street, NW, Suite 900
Washington, DC 20006
Tel: (202) 787-1060
gschaerr@schaerr-jaffee.com

Ronan, Tuzzio & Giannone
James Ronan*
Bar Number: 026211976
4000 Route 66
Tinton Falls, NJ 07753
Tel: (732) 922-3300
jronan@ronanlaw.com

* Motions for admission pro hac vice filed concurrently.